### In re KNIGHT, YANCEY & CO.

(Circuit Court, N. D. Alabama, N. E. D. October 14, 1911.)

#### No. 1,665.

BANKRUPTCY (§ 195*)—CLAIMS—PREFERENCES.

A bankrupt, having sold a quantity of cotton to German buyers, obtained payment of its drafts on forged bills of lading, and thereafter shipped cotton to cover such bills. Becoming bankrupt in the meantime, the trustee claimed the cotton in transit to Germany by ocean steamships, and the German creditors, on being advised of the fraud, caused attachments to be levied on the cotton on arrival, by which they secured a priority of claim. The German courts refusing to recognize the American bankruptcy proceedings, thereafter by a stipulation between the bankrupt's receivers and the German creditors, it was agreed that the cotton should be delivered to the German creditors on their paying $3.50 a bale in settlement of the claim of the receivers and certain Liverpool creditors, including the attachment case. *Held* that, such German creditors having secured the benefits of their settlement to the detriment of the trustee by asserting in the attachment suit that the cotton belonged to the bankrupt, they could not thereafter repudiate such position and assert ownership in themselves to claim dividends on an equal basis with unpreferred creditors while retaining their preference; and hence they were only entitled to be paid the balance after crediting on their dividends that part of the value of the cotton which was turned over to them.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 195.*]

In the matter of bankruptcy of Knight, Yancey & Co. On petition to review a referee's ruling, allowing in part and disallowing in part the claims of certain German creditors against the bankrupt estate. Affirmed.

Candler, Thomson & Hirsch, for certain creditors.
Percy, Benners & Burr, for trustee in bankruptcy.

GRUBB, District Judge. This is a petition to review the ruling of the referee, allowing in part and disallowing in part claims of certain

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

German creditors against the bankrupt estate. The creditors and trustee each ask a review; the creditors seeking allowance in full, and the trustee complete rejection of the claims. The referee applied as a credit on dividends paid on the claims, as a condition to allowance, that part of the value of certain cotton attached by the German creditors under proceedings had in Germany which was turned over to them under an agreement of settlement between the German creditors, the trustee and certain attaching English creditors, who acted in harmony with and at the instance of the trustee. The trustee did not insist upon his review upon the hearing.

The facts are agreed upon, and are set forth in a stipulation on file. The German creditors' claims arose out of the payment of drafts of the bankrupt with forged bills of lading attached calling for certain cotton which had never been delivered to the carrier by the bankrupt. Subsequently cotton corresponding to a part of that represented by the forged bills of lading was delivered by the bankrupt to the carrier and genuine bills of lading taken by the bankrupt for it, some of which were surrendered to the trustee, after bankruptcy, by the bankrupt and some of which were never forthcoming. At the time of the filing of the petition in bankruptcy, this cotton was in transit to Germany by ocean steamships. The receivers, upon learning of this situation, cabled the German creditors that they claimed the cotton for the bankrupt estate, and that the bills of lading held by the German creditors were forged. The German creditors thereafter instituted attachment proceedings against the bankrupt and the cotton under the German law. The receivers, being advised that the German law did not recognize the American bankruptcy or the rights of the trustee under it, induced certain English creditors, holders of similar forged bills of lading, to institute in the German courts similar attachment proceedings against the cotton in transit. Priority of right, according to the German law of attachments, is determined by priority of levy of the attachment. The German creditors were successful in securing the earlier levy of their writ of attachment upon the arrival of the cotton in the German port of destination. The English creditors' had agreed that the receivers or trustee in bankruptcy should have the benefit of their levy and be chargeable with the cost thereof. The law of England recognized the validity of the American bankruptcy proceedings. In this attitude of the parties, an agreement was afterwards entered into between the German creditors, the trustee, and the English creditors, whereby the attachments were released and the cotton surrendered to the German creditors upon the payment by them to the English creditors for the benefit of the trustee in bankruptcy of $3.50 a bale for the cotton involved in the attachment proceedings, and some cotton still in transit similarly situated, except that it had not yet been levied upon, and which was also to be surrendered to the German creditors.

The referee held that the attachment of the cotton in proceedings against the bankrupt was an election by the German creditors to treat the cotton as the property of the bankrupt, and to enforce collection of the claims, now sought by them to be allowed against the bankrupt

estate, out of this cotton as the property of the bankrupt, and that, so far at least as they obtained any benefit from the attachment, it operated as a payment pro tanto of their claims against the estate, and should reduce the dividends payable on their claims to that extent, upon the idea that they should be required to surrender the preference obtained by the attachment before participating in dividends. As this court concurs with the referee on this question, other questions raised need not be considered or decided.

Clearly, if the German creditors had proceeded to reduce their claims to judgments in the German courts and had subjected the attached cotton to the payment or partial payment of the judgment, this would have been a full or partial satisfaction of the claims represented by the judgment. If such satisfaction were partial and the German creditors sought to prove the unsatisfied balance of their claims in the American bankruptcy proceedings, the condition of the allowance of such claim would be the surrender of the preference acquired by the collection of part of the debt in the German attachment proceedings, which had been instituted less than four months before the adjudication. No dividends would be allowed the German creditors until the other creditors were placed on a basis of equality with them, and this could only be done by applying the amount received by the German creditors from the attachments as credits on their dividends in bankruptcy. This principle applies, though the bankruptcy law of this country is not recognized extraterritorially by the German courts so as to prevail against the German attachment proceedings.

The question remains whether the stipulated facts show that the German creditors obtained the proceeds of the attached cotton less the amount paid the trustee, by virtue of the attachment proceedings instituted by them in the German courts, since the estoppel depends upon their having secured at the expense of the trustee a benefit therefrom. The agreement between the parties, under which the benefit was obtained, as set out in the stipulation, construed in the light of the situation of the parties with reference to the German law, controls this question.

The German creditors, relying on the nonrecognition of the American bankruptcy by the German courts, instituted an attachment suit against the bankrupt in the German courts, and caused the attachment writ to be levied on such of the cotton as had arrived in the German ports, and were successful in procuring the first levy. The English creditors instituted an attachment suit at the instance and for the benefit of the American trustee in bankruptcy; but, failing to get their writ levied upon the cotton that had arrived in the port before that of the German creditors was levied, their lien was postponed to that of the German creditors, whose claims secured by it aggregated more than the value of the attached cotton. The trustee could assert no claim superior to the attachment of the German creditors by virtue of the bankruptcy, since it was not recognized, as against the attachment, under the German law. So long as the German creditors continued to rely on their attachment, the trustee and the English creditors held no showing against the cotton already arrived, and could, at most, only

hope to secure a prior levy upon that still on the ocean. If the German creditors had elected to rely upon their claim to the cotton under the forged bill of lading, and dismissed the attachment before the agreement of settlement was made, it is clear the receipt of the cotton or its proceeds under the settlement would not prevent the German creditors from proving and receiving dividends along with the other creditors upon the balance due on their claims. At the time of the settlement, however, the attachment was still held by the German creditors operative, and both they and the trustee contracted with the knowledge that the attachment was subsisting and created a prior lien to any claim either the trustee or the English creditors could assert to the cotton. The existence of the attachment at the time of settlement was of value to the German creditors in inducing the trustee to settle and of corresponding detriment to the trustee. This would be true, even though the German creditors in negotiating with the trustee relied also upon their claim to the cotton, independent of the attachment and under the forged bills of lading. In order to defeat the estoppel against the German creditors, it must appear that in making the settlement with the trustee their claim to the cotton by virtue of the attachment was not relied on by them or asserted against the trustee. The recitals of the agreement may afford an inference that the parties in making the settlement considered the claim of the German creditors arising out of the forged bills of lading as well as under the attachment. There is no room for inference, however, that the claim of the German creditors under the attachment was ignored. Section 7 of the stipulation contains this statement:

"That the attorneys for the receivers were advised by cable of the fact that the Bremen creditors had succeeded in serving the first arrest or attachment, and were also advised by their lawyers in Bremen that there was nothing to do except to settle the case on the best terms possible; that after negotiations a proposition of settlement was made by the Bremen creditors, the substance of which was that they would pay the sum of $3.50 a bale for all the cotton in settlement of the claim of the receivers and of the Liverpool creditors; that this proposition was transmitted to the attorneys of the receivers in America, and they refused to accept it, but, in turn, offered to accept the same terms, provided there was added to such agreement as submitted a new paragraph (paragraph 8 of the agreement). Thereupon this proposition was accepted by the Bremen creditors and settlement was made upon said terms, the settlement when made and duly executed being, when translated from the German into English, in words and figures as follows."

This extract from the stipulation conclusively shows that the settlement included the attachment "case" instituted by the German creditors, and that the pendency of this attachment suit was at least partly operative to induce the trustee to enter into the agreement. There are recitals in the translated agreement rather indicating that the claim of the German creditors as owners of the cotton was under consideration. The parties were contracting with reference to the future surrender of the cotton to the German creditors, and words apt to accomplish this end would naturally occur to them, rather than those expressive of the exact relation of the German creditors to the cotton.

The agreement also covered cotton that had not yet reached its destination, and had not, as yet, been levied upon by the attachment, but

the recitals of paragraph 1 indicate that it was presumed that it would upon arrival take the same course as that already subject to the levy, and the agreement provided that it should be treated on the same basis and in the same manner as that already under levy. The agreement also provided for the distribution of the total 9,750 bales among the German creditors according to the amounts called for by the forged bills of lading, and not by the amount of their respective claims in the joint attachment suit. The distribution, however, was a matter of mutual interest and arrangement solely between the German creditors in which the trustee and English creditors had no concern, and so loses its significance. Even without the last paragraph of the agreement, its language rather indicates that the claim of the German creditors under the forged bills was considered by the parties than that their claim under the attachment writ was ignored. The last clause, providing that nothing in the agreement should confer rights on the German creditors in the bankruptcy other than they would have had, in the absence of the agreement, takes away such significance from it, as the language and terms of the agreement might otherwise create.

Construed by the language of the stipulation, the settlement under which the German creditors secured the attached cotton was at least partly a settlement of the attachment suit. Having secured the benefits of this settlement to the detriment of the trustee by asserting in the attachment suit that the cotton belonged to the bankrupt, they cannot now be allowed to repudiate that position, and assert ownership of the cotton in themselves for the purpose of claiming dividends on an equal basis with unpreferred creditors while retaining their preference. The election made by the German creditors, when they accepted the settlement, was made with full knowledge of the status of their claim to the cotton through the forged bills of lading, as the recitals of the agreement clearly show.

The petitions of review are denied, and the order of the referee confirmed. The costs of said review are equally taxed against each party thereto.