O’NIELL, J.
This is a suit for damages for the death of the plaintiff’s husband, father of her three minor children, who was killed in a wreck of a passenger train on which he was employed as engineer by the defendant company.
The plaintiff claimed $30,000 damages, $15,000 for her loss of her husband’s support, and $5,000 on behalf of each child. The action was brought under the Employers’ Liability Act of Congress of the 22d of April, 1908, amended by the act of the 5th of April, 1910. The plaintiff’s husband was killed while employed as engineer on a locomotive pulling a passenger train of the defendant railway company from Kansas City, Mo., into Shreveport, La. The train was wrecked by a runaway freight car that got away from the employés of the defendant company at its yards near Shreveport, ran down the grade of the defendant’s main line, and collided with the inbound passenger train about three miles from Shreveport.
The plaintiff charges negligence on the part of the defendant company and its employés in that the runaway car was known by them to be out of repair and not equipped with the safety appliances required by law and necessary to control it. She alleges that the defendant’s employés were guilty of negligence in switching the car on the main line when they knew the passenger train was nearly due there; that they made a “flying switch” with the loaded box car, which was in itself a dangerous operation; that the car was negligently allowed to run down a steep grade at a high rate of speed into a dangerous curve in the track; that there was no one on or in control of the runaway car at the time of the collision; that the defendant’s employés abandoned the car just before the collision; and that, if any one was on the. car, he was unable to control it because of its defective condition.
The defendant tendered bond and filed a motion to remove the case to the' United States District Court, on the ground that the plaintiff and defendant are domiciled in different states. The application was denied, and the defendant’s counsel reserved a bill of exceptions, which is urged on appeal.
In its answer, the defendant denied each and every allegation of negligence contained in the petition. The ease was tried by a jury, and a verdict for $17,500 was rendered in favor of the plaintiffs, apportioned by the jury as follows: $5,000 in favor of the widow, $3,500 in favor of her seven year old daughter, $4,000 in favor of her six year old daughter, and $5,000 in favor of her two year old boy. Judgment was rendered accordingly, and the defendant has appealed.
[1] Referring to the bill of exceptions taken to the refusal of the judge to order the case removed to the federal court, the defendant’s counsel argue that the act of Congress of April 5, 1910, amending the Employers’ Liability Act of 1908, only provides that a cause shall not be removed on the ground solely that a federal question is presented in a suit under the act of Congress. They contend that the amending act was not intended *181 to prevent the removal for a cause that existed before and independent of the act of Congress of 1908, as when the plaintiff and defendant are domiciled in different states. They cite a decision to that effect by Judge Russell, of the United States Circuit Court for the Eastern District of Texas, in the case of Van Brimmer v. Texas Railroad Co., 190 Fed. 894. The act of Congress, however, makes no such exception. It provides that:
“No case arising under this act and brought in any state court of competent jurisdiction shall be removed to any court of the United States.”
This language was recently construed literally by the United States Supreme Court, in the ease of Mondou v. N. Y., N. H. & R. Co., 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44, where Mr. Justice Van Devanter expressed the opinion:
“We conclude that rights arising under the act in question may be enforced, as of right, in the courts of the states, when their jurisdiction, as prescribed by local laws, is adequate to the occasion.”
Since the decision cited by the defendant’s counsel was rendered by Judge Russell, several decisions to the contrary have been rendered by other Circuit Courts of the United States. See Symonds v. Railway Co. (C. C.) 192 Fed. 353; Strauser v. Railway Co. (D. C.) 193 Fed. 293; Lee v. Railway Co. (D. C.) 193 Fed. 685; Hulac v. C. & N. W. Ry. (D. C.) 194 Fed. 747; McChesney v. Railway Co. (D. C.) 197 Fed. 85; De Atley v. C. & O. Ry. Co. (D. C.) 201 Fed. 591; Kelly’s Adm’r v. C. & O. Ry. (D. C.) 201 Fed. 602.
We conclude that there was no error in refusing to remove the case to the United States District Court.
We, also find in the record- a plea of lis pendens, filed by the defendant’s counsel, alleging that a suit between the parties hereto on the same cause of action was pending in the federal court. But as no proof was offered in support of it, and as the plea has not been referred to in the defendant’s counsel’s oral arguments nor in their printed brief, we assume that it has been abandoned.
The only witnesses who testified with regard to the cause of the collision were four employés of the defendant company, who were witnesses for the plaintiff. There is no conflict in their testimony on any important fact.
The south-bound passenger train No. 3, in charge of the engineer, Jones, was due in Shreveport at 10:50 o’clock on the night of the collision. The switching crew in the yards in West Shreveport had orders to clear the main track ten minutes — or perhaps five minutes — before her schedule. Going in a northern direction from Shreveport, the track curves to the west and goes ..downgrade to within a short distance from the bridge over Cross Lake, about three miles from the city.
The defendant’s switching crew was engaged until some time after 10 o’clock on the night of the accident, setting out freight cars at the defendant’s yards in West Shreveport. Working under orders of the night yardmaster, the engineer on the switch engine pulled four' empty freight cars out of the yard switch on the west side of the main line, and left them standing out on-the main line while he went with his engine into the repair, track on the east side of the main line to pull out a Rock Island box car loaded with lumber. This Rock Island car was tagged for repairs:
“Draft bolts and draft timbers spread. End knocked out.”
It had to be taken to the transfer track and unloaded, in order to be repaired. Hence it seems that it was necessary to put the Rock Island car at the north end of the four empties and have the switch engine at the opposite end of them. The engineer pulled the Rock Island car out of the repair switch, backed it up to the four empties, and, believing it had coupled automatically, ordered the brakeman to put a chock under its wheels *183 and apply tlie hand brakes. Then he took the engine back into the repair track, ordered the switchman to remove the chock, release the hand brakes, and let the five cars roll down past the engine. The testimony of the switchman furnishes a graphic description of the operations and the resulting runaway, viz.:
“I was the fieldman, working under Andrews, foreman, and we set out, I believe, four empty ears that were to be put on the transfer track for transfer as bad order cars; and we then got hold of this Rock Island car, came out on the main line, áet that against the four empty cars, and that is what we call high line, by letting the brakes off the cars and running the engine past the cars and drop out so as to get on the other end, and we expected to get in the clear about 10:35. We had three brakes • set, two on the empties and the Rock Island, which I supposed had a good brake, and, when we got the engine in the clear, Andrews says, ‘Let them go;’ and I started to let the brakes off, first let them off the Rock Island car, then to the second, and let them off, and the cars started, and I went to the third and let that off, and we passed the point of the switch, and Andrews got on the head end, and the man was at the switch so as to let the engine out and come on down the main line to get these cars. After we went through the sag, under the viaduct, the Rock Island car separated from the empties. Q. The Rock Island car was the car on the north end? A. Yes, sir; and I hollered to Andrews (the foreman). I says, ‘Dick, the cars have separated.’ He says, ‘Get down and try to check it up.’ We had then about 500 or 600 feet from there to the old street car crossing, and I ran along the ground and caught this car, expecting to stop it. I got on there then, and it was going down about a 2 per cent, grade, and the brakes did not seem to apply. The fire seemed to fly from the wheels. I looked over the side. The engine then tried to catch this car, and Andrews got down and tried to make a coupling. I hollered the brakes were poor. He got within four feet of it once or twice, but the car was going faster than the engine could go. I think the car must have been going 45 or 50 miles an hour, and they followed us down and seen they could not catch us, and they blew the whistle. I stayed with the car. I understood that No. 3 was then about due out of Sheehan, and we had four or five minutes. * * * I tried the brakes two or three times. I could see the headlight when I was half way down the hill. s= * * i COuld not do anything. Then I looked at my watch a second time; and I thought the best thing I could do would be to stay with the car and give the people on the passenger train a chance for their lives. Q. When did the engineer abandon the chase? A. About half a mile from where we hit, they stopped. They did not want to come on down and be in the wreck. They blew the whistle.”
In Ms testimony, the engineer, who was on the switch engine, described the race he made after the runaway ear with Ms engine and three empty cars, viz.:
“Q. The runaway car was ahead of the engine? A. No, sir; north of us. Q. It was going down the track, and you were following it? A. Yes, sir. Q. Well did you speed up your engine to catch it? A. Yes, sir. Q. What was the reason the engine did not make the coupling? A. Could not catch the car. Q. Why didn’t you speed up? A. I pulled her wide open. Q. When did you abandon the chase? A. When No. 3’s headlight showed up coming across the bridge. Q. You slowed down then? A. I stopped. Q. What did you do then? A. I whistled the man down — two short and two long blasts of the whistle.”
The fireman on the passenger train testified that he did not hear the whistle of the switch engine; and there seems to have been no chance for the engineer, Jones, to save himself, if he did hear it. He was accustomed to being flagged at that place by the flagmen from freight trains that were unable to climb the grade. As usual, therefore, when he went over the Cross Lake bridge, he slowed down, had his train under control, and evidently believed that the switchman’s lantern on the runaway car was that of a flagman- of a tied-up freight train. His fireman described the wreck thus:
“We were coming in here on No. 3 southbound passenger train, due at the shops at 10:50 p. m., and we passed Sheehan, the last station, and we always hurry up to get in so as to get out on time, and just as we came across the lake bridge, not over three or four car lengths from the bridge, Mr. Jones shut off the engine. We were in the habit of finding some one hung up on the hill, nearly every trip or two, and they would flag us, and we would stop, and that is what I thought they had done that night. I set the fire in the engine and got where I thought I could see up the straight track. We wore on a curve to the right, and I stuck my head out of the window to see how far up it was. I looked out just in time to see the switchman jump off. (The switchman referred to was on the wild car.) I did not wait to see any more. I made a jump and lit behind Jones in the gangway, and the next time I hit the ground, and they hit, had not run a car length *185 past me when they hit lying where I was. They were coming down the hill with a lumber box car. It threw Mr. Jones out of the cab. He was on the back end of the tender when I found him, dead, just gasping. He made all efforts possible, put it into the emergency, just as I was going across the gangway. He saw the car about the same time I did. The engine was reversed when I got back to it; and the emergency brakes were applied,”
The passenger train had left the last station, Sheehan, at 10:35, on time. The watch on the dead engineer, examined three minutes after the collision, had stopped at 10:42:15. He had to go only about 3 miles in 7% minutes, to arrive in Shreveport on time.
The only evidence offered by the defendant, besides that elicited on cross-examination, was the testimony of the switchman who had climbed upon the runaway car and tried to stop it. After he had testified as a witness for the plaintiff, he was recalled by the defendant’s counsel to prove that, when the car got away, it was being taken from the repair track to the transfer track to be there unloaded and returned to the repair track to be repaired. He also testified that the car seemed to couple when it was butted against the four empties, and the brakes seemed to hold. It appears, however, that this witness was not a mechanic; and in view of the fact that the wheels of this ear had to be chocked when it was supposed to be coupled to four other cars with brakes on, and in view of the proof that the coupling and brakes both failed to work, we do not think it has been proven that the defects in the car did not affect its couplings or brakes. It is highly improbable that the defects in the ear and the failure of its coupling and brakes to be of any service were mere coincidences.
[2] Considering how near it was to the time when the passenger train would arrive —and how dangerous it seems to be to let freight cars loose at the top of a grade on the main line of a railroad at any time — it was indeed gross negligence on the part of the yard foreman and switching crew to attempt to make a flying switch with a heavily loaded car which they knew was unfit for service, and which they ought to have feared would get away from them. As was said in Mitchell v. I. C. R. R. Co., 110 La. 637, 34 South. 714, 98 Am. St. Rep. 472, citing numerous decisions:
“Under such circumstances, the making of the running switch was gross negligence. Some authorities hold making running switches to be negligence per se.”
On cross-examination of the fireman of the engine on the passenger train, the defendant’s counsel asked him:
“You did not have the passenger train under control ?”
To which the plaintiff’s counsel objected on the ground that the defendant had not alleged that there had been contributory negligence on the part of the engineer. The objection was sustained, and, on plaintiff’s counsel’s reguest, it was ordered that it should apply to all such evidence. The defendant’s counsel reserved a bill of exceptions, and insists that there was error in the ruling.
Section 3 of the Employers’ Liability Act provides:
“That in all actions hereafter brought against any such common carrier by railroad and under or by virtue of any of the provisions of this act to recover damages for personal injuries to an employé, or where such injuries have resulted in his death, the fact that the employé may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé: Provided, that no such employé who may be injured or killed shall be held to have been - guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé.” U. S. Oomp. St. 1913, S 8659.
The plea of contributory negligence, therefore, has been abolished by the federal stat *187 ute, as a defense. But counsel for the defendant contend that contributory negligence may be shown without pleading it, in mitigation of the damage, on the theory that any facts, not alleged by the defendant, may be proven to show less damages than are claimed by the plaintiff. This doctrine, supported by decisions in other jurisdictions, has no application to this case. Proof that there was contributory negligence on the part of the employé who was killed would not reduce the amount of damages suffered by his surviving widow and children on account of his death. It would only serve to reduce the liability of the defendant company. The provision of the statute, in this respect, is that “the damages shall be diminished by the jury in proportion to the amount of negligence attributable to sqch employs.” Hence the rule, requiring a defendant to plead contributory negligence in order to escape liability by proving such negligence, ought to require a plea of contributory negligence to admit proof of it to diminish the defendant’s liability. In this case, however, it cannot be seriously contended that the engineer on the passenger train could have avoided the collision, or that there was any negligence whatever on his part. The fireman testified, and it was not contradicted, that the train had slowed down and was under control.
On the cross-examination of the plaintiff, the defendant’s attorney asked her whether she was engaged to be married. Her attorney urged the objection that the matter was irrelevant; the court sustained the objection ; and counsel for the defendant reserved a bill of exceptions. The evidence intended to be elicited was, in our opinion, admissible to show that the plaintiff might not be deprived of the support of a husband during the remainder of her life. But it is not probable that an answer to the question would have affected the verdict. We assume that the jury considered the widow’s prospect of marrying again.
The evidence shows that-Mr. Tones was 53 years of age at the time he was killed; was earning $175 a month; was sober and domestic in his habits, and kind to his wife and children. The verdict is not excessive.
The judgment is affirmed at the cost of the appellant.