117 So.2d 642 (1959)
Mrs. Frances Folk HIGHTOWER, Individually and for the Use and Benefit of James Allen Hightower, Plaintiff-Appellee.
v.
DR. PEPPER BOTTLING COMPANY OF SHREVEPORT, INC. et al., Defendants-Appellants.
No. 9059.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1959.
On Rehearing and Motion to Remand January 26, 1960.
Certiorari Granted March 23, 1960.
*644 Cook, Clark, Egan, Yancey & King, Shreveport, for appellants.
Joseph R. Bethard and G. A. O'Steen, Shreveport, for appellee.
GLADNEY, Judge.
Mrs. Frances Folk Hightower brought this, a tort action to recover damages for herself and her minor son, occasioned by an automobile-truck collision which took place August 22, 1958, near the city limits of Shreveport, on the Shreveport-Mansfield Highway (U. S. No. 171). James Colie Hightower, the driver of the automobile and husband of plaintiff, was killed instantly and Mrs. Hightower received serious injuries. Named defendants in the suit are Dr. Pepper Bottling Company of Shreveport, Inc., the owner of the truck, and its liability insurer, Hardware Mutual Casualty Company. After a trial of the issues of negligence so presented, a judgment was rendered favorable to plaintiff, from which decree the defendants have appealed.
A short time prior to the accident which occurred approximately at 5:20 o'clock P. M., the plaintiff and her husband entered their 1955 Chevrolet sedan for the purpose of proceeding to the wedding of a brother *645 of James Colie Hightower, and after stopping at a gasoline station, they proceeded southward and approached an overpass. Hightower was driving at a speed which was shown not to have been in excess of fifty-five miles per hour. As the Chevrolet automobile was approaching the overpass, a Diamond T bottle truck and trailer driven by Charles Lee Lindley was traveling north at a speed of thirty miles per hour approaching the same overpass. A head-on collision between the two vehicles occurred on the north side of the overpass. Accompanying Lindley were two of his colored helpers, Lacy Williams and Nathaniel Jones. Strangely enough, these two employees were asleep at the moment of the collision.
The weather was cloudy and because of prior rain the highway was wet. Forasmuch as the point of impact was on the overpass the following facts afford some assistance in resolving the issues hereinafter discussed. The total length of the overpass was 846 feet and its width 23 feet 10 inches, and it forms an arc with a grade of 1.2 per cent (1.2 feet for 100 feet of distance). Following the impact of the vehicles the truck came to rest in its proper lane of travel, the east or northbound traffic lane, whereas the automobile was stopped 21 feet north of the point of impact on the western part of the west lane for southbound traffic, some several feet from the center line.
The accident was investigated by officers of the Sheriff's Department of Caddo Parish, two State Troopers, and by Deputy Coroner Dr. Charles S. Boone. Numerous photographs were taken for the purpose of preserving such physical evidence as tire marks, positions of the vehicles and physical damage to the vehicles. Deputy Sheriff W. D. McCall and State Trooper J. C. Skannal ascertained from the visible physical evidence, a place on the highway which they considered marked the point of impact. This point was 21 feet north of the position of the Hightower automobile after the collision and 18 inches west of the white center line of the highway. These witnesses testified that they localized the point of impact from bits of small broken glass and other debris, and tire marks found at that spot. The truck, which carried soft drink bottles, was described as being a semitrailer or a truck-trailer combination which has only one set of wheels on the trailer. The rear of the truck part of the combination unit was equipped with dual wheels and so was the trailer thereof.
A careful examination of the damages inflicted upon the two vehicles was made by Dr. William H. Tonn, Jr., an engineer who was called as an expert on collision analysis. He testified his findings as to the truck damage showed: "its left front fender and bumper received a blow extending over to the right or in depth of about six or eight or nine inches, something like that. Then there was damage to the rear wheels of this tractor unit. These rear wheels had received a blow to the left rear tractor wheels, breaking the spring hangers and breaking the drive shaft and rotating the housing, that is, both wheels, on the left and right side both, the differential had been rotated backwards approximately 30 degrees. Then the frame was bent over to the left from a blowfrom a force to the rightto the right from a force to the left a distance of three inches. The bed of the trailer had received a severe blow and the metal and so forth was bent and torn on it. Structurally the trailer had borne the force very well." The description of the damage to the Chevrolet was given by him: "* * * The point of impact or the force was applied to the left front fender which was torn off. The hood was torn off. The top of the car had been torn off and rotated backwards and the left front corner of this top at the point at which it attached to the windshield post wasthere was the imprint of the corner angles of the trailer. I measured them and determined them to be the same dimensions as those angles. I could see the print of them and I measured them and they checked out completely. The Chevrolet's steering wheel was bent down *646 and to the right, which is highly important in any collision."
Eyewitnesses to the accident who testified were Charles E. Lindley, Mrs. Frances Folk Hightower and John E. Whatley. The latter was traveling south and following the Hightower automobile. When the accident occurred he was approximately 1,000 feet away. Material evidence as previously pointed out, was also furnished by W. D. McCall and J. C. Skannal. The testimony of Lindley was discredited in several respects, by reason of (1) his having been convicted of a felony; and of more importance (2) his testimony that he did not know what were the circumstances which caused the accident. Some of the testimony of Mrs. Hightower was found to be obviously untruthful. Further, we note Whatley apparently was not observing the two vehicles ahead of him immediately before their contact, for he testified that when he looked the accident was already in progress. The testimony of W. D. McCall was not entirely satisfactory because during his interrogation he became confused as to the actual location of the point of impact with reference to the Hightower car. This apparently was due to an error made in copying the original report of the accident. Even with such uncertainty arising from the testimony of Lindley, McCall and Mrs. Hightower, we have experienced no difficulty in resolving that the point of impact actually was established and was 18 inches or more west of the center line of the highway, and within the southbound traffic lane. This conclusion is fully substantiated by the evidence. Lindley at the coroner's inquest conducted by Deputy Coroner Charles E. Boone, on the date of the accident, August 22, 1958, gave the following sworn testimony:
"Q. So as you came over the over the rise of this you call it, of this overpass, did you see this car coming toward you? A. No, sir, I didn't. I'd been having trouble with my truck the last few miles and I was working with the truck trying to get it over and trying to keep it going and I wasn't watching for cars down ahead of me, and I was staying on my side and trying to get my truck to run a little faster.
"Q. Did youin other words, to get your car going, you have to have your head down towards the dashboard? A. No, sir, not all the time.
"Q. Well, were you looking up over the dashboard? A. Yes, sir, part of the time.
"Q. Well, if that was the case, you should have been able to see this car coming. A. Well, II should have I guess, I might have seen it, but I just don't remember.
"Q. You just don't recall seeing it? A. No, sir, I don't.
"Q. Well, when did you first see this car? A. Just as I came over the overpass and started down the other side. I looked up and I saw the car.
"Q. Was it right at you? A. Yes, sir."
Mrs. Hightower testified the truck as it came over the crest of the overpass was over the center line in the southbound traffic lane and immediately before the collision the truck turned sharply to its right so that the front portion of the truck was not so far over the center line as the rear portion, the latter being about three feet west of the center line of the highway. Because the record discloses Mrs. Hightower concealed material information from her attorneys and the court, in her testimony related to the marital relations between her husband and herself, the judge considered her testimony only for the reason it was consistent with the physical evidence.
Whatley testified that when he first paid special attention to the two vehicles the truck was proceeding over the crest of the *647 overpass in its own traffic lane, and the Hightower automobile was just entering the north end of the overpass with its left wheels close to the center line of the highway. Both vehicles, he said, were traveling in a normal manner and he next noticed them when the collision was already in progress, at which time the front left corner of the trailer and the left dual wheels of the trailer were across the center line of the southbound traffic lane.
It is our appreciation of the testimony of Trooper Skannal that it was consistent and credible and we find his positioning of the point of impact as 18 inches west of the center line reflects accurately the point of impact. Referring to certain photographs, this witness testified concerning the tracks of the truck, and said:
"Previous to the impact, approximately fifty feet before impact, the tracks were 28 inches into the wrong lane. These tracks were continuous from that point until where the truck rested after the impact."
From our examination of the evidence we experience no difficulty in arriving at the conclusion the accident was precipitated by the entry of the truck into the southbound traffic lane and the point of contact between the two vehicles occurred in the southbound lane. With this finding the burden is cast upon appellants to explain the presence of the truck in the wrong lane of travel.
Our jurisprudence recognizes the rule that where a collision occurs in one of two traffic lanes, the presumption is that the driver of the vehicle determined to be in the wrong lane was negligent, and the burden is upon him to show the collision was not caused by his negligence, or that there were justifiable circumstances which would excuse his conduct. LSA-R.S. 32:231, 32:232, 32:233, subdivision C. Schick v. Jenevein, 1919, 145 La. 333, 82 So. 360; Miller v. Hayes, La.App., 1947, 29 So.2d 396; Noland v. Liberty Mutual Insurance Company, 1957, 232 La. 569, 94 So.2d 671. The evidence fails to reveal circumstances which excuse the driver of the truck from the presumption of negligence which arose by reason of his entry into the wrong traffic lane. Accordingly, we hold that the sole and proximate cause of the accident resulted from the negligence of the driver of the truck.
There remains for decision the amount of damages to be awarded Mrs. Hightower on account of her personal injuries, and also for the death of her husband, and finally, the award to be made on behalf of the minor child for the death of his father. The trial judge made a total award of $26,167.90 to Mrs. Hightower for damages arising from her injuries to her person and occasioned from the loss of her husband. These were itemized as follows: $8,000 for medical expenses, pain, suffering and disability; for mental anguish, grief, loss of love and companionship, $2,000; for loss of support $15,000 and for funeral expenses $1,160.90. The award in favor of the minor child consisted of two items, namely, for the loss of love, affection and companionship $10,000; and for expected support from his father $12,273.78. Appellants' answer strongly asserts the awards so made are excessive and should be reduced, while the appellee, on the other hand, argues the awards are entirely inadequate and should be increased. After a review of the written reasons assigned by the district judge in fixing the above named amounts, we are impressed that plaintiff's loss was most carefully appraised by the trial court.
Mrs. Hightower's injuries were unquestionably serious and we have no doubt she suffered a great deal of pain from time to time during the approximate period of four months she had been injured. This case was tried on the 18th day of December, 1958, and the accident occurred on August 22, 1958. Mrs. Hightower, following the accident on August 22nd, was rushed to the emergency room of the Schumpert Sanitarium, *648 arriving there about twenty minutes after the collision. She was under the care and treatment of Dr. Eddy from August 22nd until last seen by him on December 10, 1958. He summarized his findings as follows:
"She was seen following a car accident, at which time she hadshe was stockyher blood pressure wasn't unusually low. She had a severe laceration on her forehead; she had hematomas or hemorrhage under the skin of the face; she had a questionable fracture of the humerus; she had a fracture of the forearm that was compounded and about two inches of both bones of the forearm were exposed through the wound; she had lacerations of the wrist and lacerations of the neck and shoulder, also on both arms. The x-ray showed no fracture of the humerus. She did have a fracture of the scapula; a compounded fracture of the radius and ulna, which as I said was obvious; she was prepared and taken to the operating room where under anaesthesia she had a repair of her facial wounds and a repair of the wounds of the shoulder; the scapula fracture did not require any operative treatment; she had an open reduction of the right forearm following the removal of a large amount of damaged muscle and soft tissue. The fracture of the radius was held with an intramedullary pin. The fracture of the ulna did not have any internal fixation. She was kept in the hospital. She was given blood during the time she was on the operating table during this procedure. She was kept in the hospital the next ten days, I think, during which time she had marked swelling of the affected hand in the cast. She had a moderate amount of bleeding into the cast; considerable pain in the involved extremity and the involved shoulder. The wounds of the face healed well. Later she was followed as an out-patient in the office, where on September 12th the cast was changed and x-ray at that time was taken at the Schumpert Sanitarium that showed good position and alignment with some early union. She has continued to be seen at the office and the last time she was seen was December 10th, 1958, at which time her complaints were fainting spells and headaches; no convulsive seizures. She complains that the arm hurts at times; that is, the right arm, right forearm; she complained of tenderness over the pin in the wrist. The clinical appearance at that time was that the forearm felt strong; both bones felt strong. There were, of course, the extensive scars of the compounded wounds over the forearm. The facial wounds I considered to have a good result. They were looking better. Her general condition seemed better at the time but she remained extremely tense and nervous. The motion in the right elbow was normal. Flexion and extension in the wrist was normal. Supination and pronation, that is turning the hand palm up and palm down, was limited to fifty per cent of its normal range. X-ray of the forearm at that particular time showed what appeared to be good bony union in the radius and questionable union in the ulna. I think that summarizes her down to this point."
The doctor further testified that her forearm had suffered a severe fracture with a lot of soft tissue and that she would continue to have tenderness for about six months; that she would always have probably fifty per cent limitation of the supination and pronation in the use of the right forearm and hand. He appeared satisfied that the other injuries would return to normal with the exception probably of a scar on the forehead which he did not consider too severe and said it would improve with time, but would, no doubt, be permanent. At the time of trial unquestionably plaintiff was experiencing some pain and she complained of headaches which Dr. *649 Eddy attributed more to worry than to any physical cause.
Concerning the award for loss of love and affection as a result of the death of her husband, the trial court concluded there were no very close bonds of affection between plaintiff and her husband corresponding to the deep attachment usually found between those who have been married for a longer period of time. Plaintiff married the deceased October 12, 1955, when she was at the age of fourteen. Although she apparently spent short periods with her husband during his term of military service, she continued to work as a waitress. James C. Hightower entered the military service on March 16, 1955, and was discharged on March 16, 1958. Their young child, James Allen Hightower, was born on February 1, 1957. Following his discharge, Hightower instituted a suit for divorce in Texas on April 4, 1958. Thereafter plaintiff on May 20th executed a waiver of citation in which she acknowledged that the suit was pending against her for divorce and she consented that it could be heard and tried without her presence. James C. Hightower made payments to his attorneys on May 20 and July 11, 1958, and never did terminate the attorney-client relationship which had existed. The record leaves but little doubt that the marriage was not a very happy one and was interrupted by quarrels of extreme nature. On July 4, 1958, a month and one-half prior to the accident, plaintiff and her husband had a fight of such nature that the landlady requested them to move from the premises. After a consideration of all the evidence, the judge applied the following general principles applicable to an award of this kind:
"In general, damages for the death of a husband have been awarded in Louisiana for the loss of love and affection and for the loss of earnings.
"Neither of these items is susceptible to computation with mathematical precision. Many imponderables and intangibles exist. All persons do not suffer the same amount of grief at the loss of their spouse. All persons do not suffer the same loss when the earnings of the spouse are terminated. Many facets of the marital relationship need to be developed before an intelligent award of damages can be made. For example, the frugality of the husband is a relevant matter. His contribution from his earnings to the community of acquets and gains will bear upon the widow's loss when his earnings cease. The loss of a spendthrift and profligate husband, who contributes nothing but groceries and rent money to his household is not nearly so damaging as the loss of a husband who employs his earnings almost wholly for the benefit of the community that exists between him and his wife.
"Evidence of a husband's employment record is always relevant. His chance for advancement is relevant. All matters relating to the question of whether his earnings will continue on the same level, increase, or diminish, are relevant. Just as surely, the question of whether or not the parties to the marriage were estranged at the time of the death of one spouse should be considered.
* * * * * *
"It is possible for a married couple to have a stormy period, from which they emerge more mature and better fitted for a happy married life. The evidence in this case does not preponderate in that direction."
Another factor which has made it much more difficult to properly determine the award in this case is the untruthfulness of Mrs. Hightower which was reflected in a number of instances during the trial. The record, however, is insufficient to justify the granting of a greater award than was allowed by the trial judge.
*650 The deceased was born November 1, 1937, and accordingly at the time of his death he was not twenty-one years of age. Some time shortly after the termination of his military service, James C. Hightower went to work with his stepfather as a cement finisher, for which he earned approximately $280 per month. For loss of support the court awarded Mrs. Hightower the sum of $15,000. There is no dispute concerning the amount of funeral expenses. Our study of the issue of quantum impels us to the conclusion that the total awards of $26,167.90 to Mrs. Hightower individually, and $22,273.78 for the minor child are neither excessive nor inadequate, and accordingly, the judgment from which appealed is affirmed at appellants' cost.

On Rehearing
HARDY, Judge.
Although we were primarily influenced to grant a rehearing in this case for the purpose of allowing thorough consideration of the issues presented by defendant's motion to remand, nevertheless, the rehearing was not restricted, and, accordingly, we have undertaken a thorough re-examination and reconsideration of all matters originally considered and disposed of by our first opinion.
It is insistently contended by distinguished counsel for defendant-appellant that plaintiff widow in the instant case is not entitled to any recovery for loss of love or affection, nor for loss of support. In urging error on the part of both the trial court and this court, in the allowance of damages to plaintiff widow for loss of love and affection, counsel reiterates the contention that the record bears out the conclusion that the relations between plaintiff and her deceased husband were not marked by the normal bonds of affection which should and customarily do exist between husband and wife, citing authorities in support of this proposition.
On this point it suffices to say that both the trial court and this court gave thorough and detailed consideration to this point and reached the very conclusion that has been so diligently urged by counsel for defendant. The damages allowed the plaintiff widow for loss of love and affection were fixed by the trial court in the nominal sum of $2,000, which amount was accepted and approved by this court. Re-examination of this question serves only to convince us of the reasonable nature of this award under a full understanding and appreciation of the facts and circumstances surrounding the marital relations of the parties.
For the first time before this court counsel for defendant now urges error in the award of funeral expenses as an item of damages in favor of plaintiff widow. It is argued that the only evidence in support of this item is a bill directed to Mrs. Holbert, the mother of decedent, and counsel submits that the expenditure represented could only be recovered by Mrs. Holbert, under the authority of Andrus v. White, 236 La. 28, 106 So.2d 705. It should be pointed out that in the cited case the opinion of the Supreme Court recognized the right of recovery of funeral bills by the ranking beneficiary under Article 2315 in those instances where such beneficiary is legally obligated for payment thereof. In the instant case we can attach no significance to the fact that the bill was directed to defendant's mother, inasmuch as there is no evidence which establishes her payment thereof. So long as the bill is unpaid it must be considered a charge against the surviving widow, for which she is entitled to recover as an element of damage.
We are further persuaded to the correctness of the allowance of this item by reference to the record before us, which discloses that counsel for defendant, upon tender of the funeral bill, expressly stipulated the amount of the funeral expenses in the sum of $1,167.90, and allowed the admission of the bill in evidence without objection. Of additional import in this *651 connection is the fact, as above noted, that no opposition was made to this item either in brief or argument before this court on original hearing.
Careful restudy of the basis and award of damages fails to indicate the necessity for any change therein, unless the same is affected by the representations of defendants' motion to remand, which we now proceed to consider.

On Motion to Remand
Subsequent to our judgment affirming the judgment of the district court, counsel for defendants filed a motion to remand, which represented that Mrs. Francis Folk Hightower, plaintiff-appellee, had remarried, and, further, that she has been undergoing "treatment for mental infirmity" in the psychiatric ward of the Schumpert Sanitarium in Shreveport. A supplemental brief represents that the remarriage took place some seven months following the accident and only eight days after signing of the judgment in favor of plaintiff.
Upon the basis of the above representations the motion averred that evidence of the remarriage of Mrs. Hightower was material to the issues presented in the case, and particularly to the award made for loss of support; and, further, that because of the "mental infirmity" of plaintiff she lacked the capacity to stand in judgment for herself or her minor son.
We proceed to a discussion of the above contentions in order.
The first question to be determined is whether evidence of remarriage is admissible and relevant.
In our opinion the above question has been determined by such an overwhelming weight of authority that it scarcely merits extended discussion. However, the instant case has been so bitterly fought, and counsel for the respective parties have argued their positions with such vigor and at such length, including the filing of exhaustive briefs on original and rehearing totaling something less than 200 pages, that we find it desirable, under the circumstances, to devote somewhat more attention to the development of the reasons supporting our conclusion than would ordinarily be considered necessary, even though this entails the formulation of what we regard as an inordinately lengthy opinion.
We thought to have disposed of the relevancy and admissibility of evidence of the engagement or remarriage of a widow claiming damages under LSA-C.C. art. 2315 in the case of Stephens v. Natchitoches Parish School Board, La.App., 110 So.2d 156, 165, by the following pronouncement:
"The record before us establishes the remarriage of this plaintiff on August 31, 1957, more than two and one-half years after the death of her first husband, Searcy B. Stephens. The general rule, supported by what appears to be an overwhelming weight of authority in other jurisdictions and enunciated in 30 A.L.R. 123; 16 American Jurisprudence; (verbo `Death') § 234; and 25 C.J.S. Death § 114, p. 1263, is that the fact of remarriage of a surviving spouse is not to be considered as affecting or in any degree mitigating the damages to which such spouse would be entitled. As was observed by counsel for plaintiff in brief, it appears that the only pronouncement on this point in Louisiana Jurisprudence is to be found in Jones v. Kansas City Southern Ry. Co., 137 La. 178, 68 So. 401, in which the court declared that the evidence as to the engagement of the plaintiff widow to be remarried was irrelevant. The court further declared that even if such an engagement should actually result in remarriage, it did not follow that the condition of the plaintiff would be bettered. Finding ourselves in complete accord with the weight of authority on this point, and sustained in this conclusion by the pronouncement of the Supreme Court *652 of our State in the case above cited, we have no hesitancy in holding that the engagement of a spouse, or the actual remarriage, is completely irrelevant to a consideration of the damages to which such spouse is entitled."
In brief in support of application for and on rehearing in the instant case, learned counsel for defendants vigorously attacks our conclusion, as expressed in the above quotation, on the grounds that we were guilty of egregious error in making the observation that the only pronouncement on this point in Louisiana jurisprudence was to be found in Jones v. Kansas City Southern Ry. Co., 137 La. 178, 68 So. 401, and further that both the Jones case, upon which we relied, and the Stephens case, in which we approved and adopted the rule, had been overruled.
As to the first above noted contention of error, we fail to be convinced by counsel's citation of O'Connor v. Chicago R. I. & P. Ry. Co., La.App., 40 So.2d 663, 667. The full extent of the consideration given by our brethren of the First Circuit to the issue of remarriage in the cited case is contained in the following extract from the opinion:
"LeRoy O'Connor was 18 years old and his wife was the same age and they had no children, and she had remarried at the date of the trial, June 18, 1948, which was within one year and five months after the accident. The record does not show the exact date of her remarriage. However it would seem that her grief was, therefore, shortlived and the deep attachment usually formed between those who have been married longer is not reflected by the evidence. O'Connor was earning approximately $24 per week or $1,248 per year and it would therefore appear to us that the judgment of $1,500 for loss of earning capacity, support and maintenance was correct. The item of $485 for funeral expenses is undisputed. As to the judgment for $6,000 for mental anguish, grief, loss of love, affection and companionship, under the scant evidence, we believe, should be reduced to $2,500."
It is obvious that the above recital is purely and exclusively factual and contains not one single word which can be regarded as the pronouncement of a legal principle. It is equally obvious that no issue was made of the relevancy, materiality or admissibility of the fact of remarriage, and it can only be concluded that evidence on this point was adduced and admitted without objection. Upon this basis it follows that the court, on appeal, was justified in taking these facts into consideration. However, we cannot acquiesce in any conclusion that the statement of fact and the assessment of damages on the basis thereof represents the enunciation of a rule or principle of law. It is appropriate to observe that the holding of the court as to the fixing of damages represented by the above quotation is headnoted in the syllabus of the publisher under the Keynumber 99(4) verbo "Death", which refers to the allowance of of damages to a surviving husband, wife or children and not to any question of mitigation or reduction of damages which is identified with the Keynumber 91.
We remain convinced that our observation in the Stephens case was correct.
As to the observation that both the Jones and Stephens cases were reversed, counsel must be well aware of the fact that the reversal in neither case was based upon the point under examination. The Supreme Court of the United States reversed the Jones case (see 241 U.S. 181, 36 S.Ct. 513, 60 L.Ed. 943) on the ground that the Louisiana Supreme Court erred in excluding evidence of contributory negligence in an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. This was the only issue considered by the United States Supreme Court, and the decree remanded the cause for further proceedings. Pursuant to such remand the Supreme Court of Louisiana again considered the *653 case on both an original and a rehearing. The report thereof is set forth in 143 La. 307, 78 So. 568. It is noteworthy to observe that the opinion of our Supreme Court did not reconsider its pronouncement with respect to the irrelevancy of the engagement or remarriage of a surviving widow, and it is further evident, from the allowance of damages made, that this point was not regarded as effecting a mitigation or reduction thereof.
It is also apparent, from even a casual reference, that the reversal of our judgment in the Stephens case, as effected by the Supreme Court, 238 La. 388, 115 So.2d 793, was predicated solely on the question as to whether the act of the Legislature authorizing a plaintiff to file the suit, waived not only the State's immunity from suit but also its immunity from liability for torts. Under the recently pronounced determination of such question, as enunciated by the Supreme Court in Duree v. Maryland Casualty Co., 238 La. 166, 114 So.2d 594, the judgment of this court was reversed. Again we emphasize the fact that no pronouncement was made upon the question of remarriage.
The reason for the majority rule as to the admissibility of evidence of remarriage was succinctly but eloquently set forth in the opinion in The City of Rome, D.C., 48 F.2d 333, at page 343, as follows:
"The best basis I have seen in the state decisions for refusing to mitigate damages of a widow because of remarriage is stated in Georgia Railroad & Banking Company v. Garr, 57 Ga. 277, 280, 24 Am.Rep. 492, and St. Louis I. M. & S. Ry. Co. v. Cleere, 76 Ark. 377, 386, 88 S.W. 995. If we should enter upon an inquiry as to the relative merits of the new husband as a provider, coupled with his age, employment, condition of health, and other incidental elements concerning him, unavoidably we should embark upon a realm of speculation and be led into a sea of impossible calculations."
While we think the above observations are more than sufficient to set the question at rest, we proceed to further discussion in order to answer contentions of counsel for defendants, even at the risk of piling Pelion upon Ossa.
Counsel seizes upon the pronouncement in the written opinion of the trial judge:
"The most Mrs. Hightower could expect from her husband to any degree of certainty is money for her support, or alimony.",
and argues that inasmuch as "* * * the opinion of the trial judge, which was affirmed by this court, is based upon the bare claim of the widow for loss of support in the nature of alimony * * *" (emphasis supplied), the remarriage of plaintiff would prove that she was not entitled to any substantial award for loss of support, and, accordingly, that evidence of remarriage is admissible and relevant.
If counsel is not already aware of the fact, we think he should be informed that the judgment of an appellate court affirming a judgment appealed from does not necessarily imply an endorsement and approval of the reasons upon which the original judgment was based. The reasons which support the conclusion of an appellate tribunal are set forth in its opinion and are not to be regarded as an acceptance of the reasons of another court, which may have led to the same conclusion, unless such reasons are specifically expressed and adopted.
This brings us to the necessity for declaring that the judgment of this court was not "* * * based upon the bare claim of the widow for loss of support in the nature of alimony * * *", but was based upon the right of the widow and child of decedent to the recovery of damages under the specific provisions of LSA-C.C. art. 2315.
*654 There seems to be a deal of misunderstanding and misconception on the part of members of both Bench and Bar with reference to the origin, nature and purpose of the statutory codal provisions contained in Article 2315. This article represents the very foundation upon which all tort law in Louisiana has been constructed; it provides the causes giving rise to tort actions and denominates the persons who possess the right to assert such causes of action, as well as the preferences among the different categories of such claimants. The article has no relation to the common law; derives none of its history or effect therefrom, and, therefore, is not susceptible of interpretation upon the basis of common-law principles. As was observed by Judge Drew of this court in Gott v. Scott, La.App., 199 So. 460, 463:
"The only liability for torts in this State is found in the provisions of the Code and statutes of the State. Text books are often referred to for the purpose of interpretation, but never as law creating a tort liability."
The articles written for the Tulane Law Review (Volume XVI, page 489, and XVII, page 159) by Dr. Ferdinand Stone, distinguished Professor of Law on the faculty of Tulane University, discuss, in a scholarly and convincing manner, the history, development and purpose of the tort doctrine in Louisiana. In the second of these articles there appears the following observation, which we think should be borne in mind by all members of both Bench and Bar:
"As the number of decided cases in Louisiana has increased, lawyers and judges have been tempted to rely upon cases rather than upon the Code itself, with the inevitable result that the forest has oft been obscured by the trees."
We think the idea expressed could well be adopted as a guide, and we feel that its application will save us from floundering in the quagmire of minute distinctions and differentiations between cases and permit us to walk upon the firm ground of the unambiguous principles and purposes established by Article 2315.
In brief on rehearing counsel for defendant makes the somewhat amazing observation, in the nature of a promise, that:
"* * * we will set forth Louisiana authorities holding that evidence of remarriage is admissible and relevant in an action for wrongful death brought under Article 2315 of the Louisiana Civil Code."
In support of the above promise counsel cited Huberwald v. Orleans Railroad Company, 50 La.Ann. 477, 23 So. 474; Brock v. Friend, 4 La.App. 723; and O'Connor v. Chicago R. I. & P. Railway Company, La. App., 40 So.2d 663.
The Huberwald case has no possible relation to the point under examination. The case was heard by the Supreme Court in 1898, at which time the right of action specified by Article 2315, as it then existed, was limited to minor children. The conclusion of the court simply held that under the article a claimant who was a minor at the time of the father's death, but who attained majority prior to the bringing of suit, no longer possessed the quality required by the statute. It is noted that counsels' argument as to the effect of the Huberwald case is based, not upon the independent reasoning and opinion of the court, but upon a quotation contained therein, derived from Blackstone's Commentaries. We firmly deny any appropriate relationship between the quoted comment and the point which we have under consideration. Additionally, we would point out the fact, as above observed, that our codal article, which is the foundation of tort actions, has no relationship with common-law principles. Furthermore, it should be observed that the antiquated observations of Sir William Blackstone have been long regarded, even in common-law jurisdictions, as bearing little, if any, weight. The distinguished *655 Barrister-at-Law, Frederick Sherwood, epitomizes the low esteem in which both Blackstone as an authority and his commentaries as precepts are held, in the following words:
"Blackstone was by no means a scientific jurist. He has only the vaguest possible grasp of the elementary concept of law. He evidently regards the law of gravitation, the law of nature, and the law of England, as different examples of the same principleas rules of action or conduct imposed by a superior power on its subjects.
* * * * * *
"In the English law institutional writers are not recognized. * * * Consequently Blackstone is seldom or never referred to as an authority. His commentaries are recommended for their literary value * * *.
* * * * * *
"And there is a reaction in favour of regarding Blackstone's great work from the standpoint of true historical and literary criticism as a complete work of art of the greatest literary merit, inadequate in deep learning, unscientific in arrangement, often mistaken in very elementary matters, but a genuine outcome of 18th century culture and a true exposition of the 18th century standpoint." (Emphasis supplied.)
Nor do we perceive any supporting authority for counsel's contention in the Brock case, in which the defendant contended that plaintiff widow had lost her right of action by reason of marriage before institution of suit, and that she had no right of action at the time she filed suit. The court, however, properly observed that the resolution of the question depended upon the provision of Article 2315, as it had been amended by Act 159 of 1918, and that since the law provided that the widow should have the right of action, such action was not forfeited because of her remarriage. We particularly call attention to the observation of the Court that the statute (Article 2315) did not provide for a forfeiture of the action on account of a subsequent marriage. It is true that the court made the gratuitous observation, which counsel emphasizes, that it was not as well satisfied about the plaintiff's right of action at the time as it would like to be, but the reasons which prompted this lack of satisfaction were not enunciated in the opinion.
It is unnecessary to make further reference to the O'Connor case, which we have discussed supra.
Careful study of the above cases fails to disclose the establishment of any legal principle or the statement of any judicial conclusion which would support counsel's contention in the slightest degree.
Next counsel proceeds to argue the asserted analogy between the right of a surviving spouse to recover for loss of support under Article 2315, and the right of a surviving widow in necessitous circumstances to recover under Article 3252 of the LSA-Civil Code, citing Jones v. Massachusetts Bonding & Insurance Company, La.App., 55 So.2d 88; Franek v. Brewster, 141 La. 1031, 76 So. 187, and Jackson v. Gordon, La.App., 186 So. 399. We are of the opinion that there can be no possible relationship between the right of action for damages against a tort-feasor under Article 2315 and the right of action of a widow in necessitous circumstances against the succession of a deceased husband under Article 3252. The analogy which was attempted by the opinion of the First Circuit Court in the Jones case was designed for the purpose of meeting the contention that a spouse had forfeited her right of action under Article 2315 "* * * in that she was living separate and apart from the decedent, was not dependent upon the deceased nor receiving any support from decedent, and living in adultery with another *656 man." [55 So.2d 89.] While we think that the court would have been better advised to have pitched its conclusion squarely upon the unambiguous provisions of Article 2315 rather than straining for a somewhat far-fetched analogy with an independent and unrelated article of the Code, we are in complete accord with the ultimate conclusion which was worded as follows:
"To hold with the plaintiff we would be legislating, in that the codal article makes no distinction between a faithful and unfaithful wife or surviving spouse, in the absence of legal action by the husband and the severing of the matrimonial tie."
In the course of the above expressions we have repeatedly emphasized the plain and unambiguous wording of Article 2315, which does not limit the right of action, under which plaintiff in this case proceeds, to an unremarried spouse nor a spouse in necessitous circumstances. To sustain the contention of counsel for defendant that the remarriage of a surviving spouse is relevant and material would necessitate the commission of one of the unforgivable judicial sins, that is, the enactment of legislation under the guise of judicial interpretation. To effect this undesirable and completely extrajudicial purpose it would be necessary to write into the Act before every mention of the words "surviving spouse" the word "unremarried". Such an action would not only be unjustified but it would open the door to other amendments which would ultimately substantially destroy the rights plainly provided by the article. For example, unquestionably, it would be contended that even an unremarried spouse would have no right of recovery except in cases of severe hardship or necessitous circumstances, and our courts would then be called upon to further amend the provisions of the codal article by declaring that only an unremarried spouse in necessitous circumstances should have the right of recovery. The same nature of amendment would then be urged as appropriate to all other classes of actors in whom the right of action survives in accordance with the specific provisions of the article.
We cannot conceive, under any rule of law or logic, a sound reason for admitting evidence as to the remarriage of a surviving spouse as ground for mitigation or reduction of damages.
Although defendant's motion to remand, as pointed out early in this opinion, was further predicated upon the contention that plaintiff was undergoing psychiatric treatment, we note that this point has not been mentioned in brief of counsel for defendant, on rehearing. When questioned by the court during the course of oral argument, counsel did not indicate any vigorous insistence upon this issue. We do not consider that the asserted ground contains any element of justification for a remand. An individual, unless formally subjected to interdiction proceedings in accordance with the provisions of law, has the right to stand in judgment for himself and as legal representative of others. In this day of strain and tension it would indeed be a dangerous doctrine to pronounce psychiatric treatment, per se, as being evidence of incapacity. In any event, defendant's interest in this condition at the present time is purely academic. If and when the interest becomes real, the question can be raised and adjudicated in appropriate proceedings.
It follows that the motion to remand should be, and accordingly it is, denied.
Having reasserted the conclusion that the award of damages is neither inadequate nor excessive,
It is now ordered, adjudged and decreed that the judgment of this court, as pronounced on original hearing, be and it is reinstated and made final.