SEBALD STAHL, Plaintiff-Appellee, *v.* FORD MOTOR COMPANY *et al.*, Defendants-Appellants.

Third District   No. 77-476

Opinion filed October 26, 1978.

John E. Cassidy, Jr., of Cassidy, Cassidy, Mueller & Price, of Peoria, for appellants.

James L. Hafele, P. C., of Peoria, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This is an appeal from the entry of judgment by the circuit court of Peoria County after a jury verdict. The jury had awarded the plaintiff, Sebald Stahl, $75,000 in damages for injuries which he suffered in a single vehicle collision. Stahl did not allege that the defendants, Ford Motor Company and Peoria Motors, Inc., were liable for the injuries proximately caused by the original collision, but he did allege that Ford and Peoria Motors were strictly liable in tort for the aggravation of Stahl's injuries caused by the defective design of a seat belt mechanism which became detached from the cab of the truck Stahl was driving.

On November 23, 1971, Sebald Stahl was an employee of the Westinghouse Air Brake Company (hereinafter known as WABCO). On that date and in the course of his employment, Stahl drove a 1971 Ford C-750 CL truck southward from Fort McMurray, Alberta, Canada, toward Edmonton. The truck had been manufactured by the Ford Motor Company and sold to WABCO by Peoria Motors, Inc. The cab of the truck was designed with a bench seat. The shift lever was located on the right side of the steering column, the parking brake lever and the ignition switch were located on the dashboard on the left side of the steering column. The cab of the truck was equipped with seat belts. Before Stahl left Fort McMurray, he buckled his seat belt.

Stahl proceeded southward toward Edmonton on Route 63 which is paved for approximately 10 miles out of town. The temperature was slightly above zero. The heater in the cab was on and when the cab heated Stahl pulled off the road, stopped the truck, and took off his jacket. He rebuckled the seat belt and pulled in the slack so that the belt was reasonably tight.

Stahl continued southward after he left the paved portion of the roadway. The road was icy and rutted and snow was compacted on the road. There was still some falling snow and some drifting.

Stahl was driving at about 45 miles per hour. The truck was geared so that it would slow down when the driver removed his foot from the accelerator. The truck slows rapidly due to engine drag in the driveline.

As Stahl continued southward, a tractor with a lowboy trailer approached from the south. Both that driver and Stahl attempted to stay close to their respective shoulders. The other truck trailed a cloud of snow because there was a great deal of powder snow in the air. Stahl could not see the shoulder clearly because of the cloud of snow and therefore he simply slowed the truck in an effort to control it. After the cloud passed, Stahl saw that he was too far over to the right and he attempted to correct this. He found that when he attempted to straighten the truck it veered across the center line and then back onto the right shoulder. The back of the truck fishtailed and he could not straighten out. He was driving at

approximately 35 miles per hour when he was blinded by the snow cloud and he was driving at approximately 30 when he tried to straighten the truck.

The truck left the shoulder and started down the embankment. The slope had a three to one ratio downhill. This meant that there was a three foot horizontal extension for each one foot of drop. There was a 15-20 degree angle to the slope. The slope was smooth and snow covered but bumpier than the road. The truck proceeded down the slope at approximately a 30 degree angle from the road and traveled approximately 1,000 feet. Stahl held onto the steering wheel in an attempt to hold the truck in the direction it was travelling and to come to a safe stop. The truck slid down the incline and crossed a shallow valley where there was a severe bump. The truck rolled slightly up hill and the left side of the cab struck the embankment.

Upon impact, Stahl noticed that glass was flying and the rear windshield was broken as well as the front windshield. He found himself somewhat off the front seat sitting on it with one buttock and leaning either against the door sill or the left door itself. One shoulder was up against the back seat. Stahl had not lost consciousness and had not suffered a blow to the head, although he could not remember exactly what happened in the cab of the truck. Stahl reached for the seat belt to unbuckle it. The belt was no longer there.

When Stahl examined himself, he found a deep gash in his left wrist. His watch was hanging on by a thread. His left foot was trapped and he couldn't move and he had no strength in his left leg. Stahl did not have pain in his hand or knee but did have pain in his toes caused when his foot had become trapped. The floorboard on the left side of the truck heaved up an inch or two and pushed the toe of his shoe and foot up against the cover plate. He had a bruise on his chest.

When driving in a normal position the driver straddles the steering column; one foot is on the left side and the other on the right. After the accident, Stahl's left foot was on the left side of the steering column, in the same position it would have been had he been driving normally and wearing a seat belt.

In the collision Stahl suffered a comminuted fracture of the left wrist and a broken left kneecap which was later removed.

The first amended complaint filed by Stahl against the Ford Motor Company complained that Ford designed, manufactured, and sold the truck which was in an unreasonably dangerous condition at the time it left the control of Ford because the design of the mechanism by which the seat belt assembly was attached to the frame of the truck was defective and because the installation of the mechanism by which the seat belt assembly was attached to the frame of the truck was defective. It also

alleged that the parking brake lever on the motor vehicle was positioned and mounted on the dashboard and was allowed to protrude from the dashboard so that the operator was exposed to great bodily harm during collision and roll over conditions. As a direct and proximate result of one or more of the unreasonably dangerous conditions alleged, the seat belt assembly detached from the frame of the truck at some time during the vehicle collision and this permitted plaintiff to strike with great force and violence against diverse parts of the interior of the cab, including the parking brake mounted upon and protruding from the dashboard of the truck, by reason of which Stahl suffered injuries. The same allegations were alleged against Peoria Motors which sold the truck to Stahl's employer, WABCO.

Trial commenced on May 13, 1977. Stahl and his experts testified; Ford presented no evidence. The jury found in favor of Stahl and against Ford and Peoria Motors and assessed damages at $75,000. (Ford Motor Company and Peoria Motors are hereinafter collectively referred to as Ford.)

Upon appeal Ford claimed that: (1) Stahl failed to produce any evidence from which the jury could apportion the damages between those injuries which were caused by the defective design and those which probably would have occurred as a result of the impact or collision absent the defective design and therefore Ford is entitled to judgment as a matter of law; (2) the giving of Stahl's instruction number 8, which is IPI Civil No. 15.01, over Ford's objection constituted reversible error entitling Ford to a new trial.

It must be remembered that Ford does not challenge the allegation of defective design, nor does Ford challenge that it could be held liable for injury to Stahl.

■■ ■ It is well settled that a manufacturer can be held strictly liable in tort for an unreasonably dangerous condition of his product, which was the result of a design defect. (*Nanda v. Ford Motor Co.* (7th Cir. 1974), 509 F.2d 213; *Buehler v. Whalen* (1976), 41 Ill. App. 3d 446, 355 N.E.2d 99.) A complaint which alleges specific defective conditions in the manufacture and design is sufficient to state a cause of action under Illinois law. (*Juenger v. Bucyrus-Erie Co.* (E.D. Ill. 1968), 286 F. Supp. 286.) Strict liability is imposed against the manufacturer in cases involving products where a defective condition makes them unreasonably dangerous to a user. Defectively designed products are unreasonably dangerous because they fail to perform in a manner reasonably to be expected in light of their nature and intended function. *Allen v. Kewanee Machinery & Conveyor Co.* (1974), 23 Ill. App. 3d 158, 318 N.E.2d 696; *Williams v. Brown Manufacturing Co.* (1968), 93 Ill. App. 2d 334, 236 N.E.2d 125, reversed, 45 Ill. 2d 418, 261 N.E.2d 305.

Since there is no question that strict liability in tort for defective design exists and there has been no challenge on appeal, we shall direct our opinion to the question of damages.

The purpose of a seat belt is to mitigate the injury during a collision. The seat belt does not prevent injury. Even when seat belts are worn certain types of injuries do occur. Wrist and knee injuries are classic seat belt injuries. This is admitted by Stahl. However, Stahl contends that even though these injuries were likely to occur while he was wearing the seat belt, they would not have been as severe if the seat belt which he had been wearing had remained attached to the cab of the truck. We agree with this contention.

Ford attempts to show by cross-examination that the seat belt assembly which attached the belt to the frame of the cab had been tampered with after it left the control of Ford. Stahl's expert witness, however, testified that the markings on the hook which was attached to the seat belt matched the eyebolt which was attached to the cab and which had been attached to the hook. While it was not possible in the courtroom to reconstruct the same conditions which caused the hook to become detached, we do think that there was sufficient evidence for the jury to conclude that the belt assembly became detached from the frame of the cab during the collision.

Stahl presented evidence that the kinetic energy of an unrestrained moving body is five times greater than that of a restrained moving body. Therefore, a body which was under pelvic restraint by a lap-type seat belt would still move but that movement would be only one-fifth as great as the movement of a body which was not under pelvic restraint. The injury done to the unrestrained body would be five times as great as that done to the restrained body.

It is impossible for us to reconstruct exactly what happened in the cab of the truck when the occupant of the cab is not certain what happened. It is possible, however, to determine with a high degree of probability what happened based upon the physical evidence. The expert witnesses testified that it was possible that the injuries which occurred would have occurred even though the seat belt had restrained Stahl, but that it was very probable that the injuries were five times greater than they would have been had he been restrained.

● 3 We will not attempt to set down a rule here regarding the measure of damages to be used in second impact situations. It was the concern of Ford that the jury should hear sufficient evidence so that it might apportion damages between the original injury and the aggravation of that injury. We quarrel not with that concern. In a negligence tort case we would not permit the entire amount of damages to be assessed against either the original tortfeasor or the subsequent tortfeasor. Two separate

and distinct torts would have been committed and we would insist that the damages be apportioned on the basis of the injury done by each tortfeasor. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Gertz v. Campbell* (1973), 55 Ill. 2d 84, 302 N.E.2d 40.) Therefore, we must also insist in a strict liability case that damages be apportioned. The case at bar is not the typical second impact case because this is a single vehicle collision and there was apparently no fault to be found which caused the truck to leave the roadway and shoulder and slide down the embankment. The fault complained of is the defect in the seat belt mechanism and the location of the parking brake lever.

We believe that the apportionment of damages is a factual question for the jury and we believe that there was sufficient evidence here for the jury to conclude that the injuries were five times greater than they might have been absent the defective design of the seat belt mechanism.

■ Ford also complains that the giving of Stahl's Instruction No. 8 (IPI Civil No. 15.01) in its entirety was error. The Instruction reads:

> "When I use the expression 'proximate cause', I mean that cause which, in the natural or probable sequence, produced the injury complained of. *It need not be the only cause, nor the last cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.*"

We are well aware that the notes on use and the comments following the pattern instruction suggest that the underlined material in the instruction not be used unless there is a third independent factor involved. In this particular instance, however, we believe that the failure of the trial court to give the entire instruction would permit Ford to escape liability by arguing that it had not caused the original injury to Stahl and thereby confuse the jury. We cannot permit such a result.

For the reasons stated above, the judgment of the circuit court of Peoria County is hereby affirmed.

Affirmed.

STOUDER, P. J., and STENGEL, J., concur.