596 So.2d 225 (1992)
Gene Douglas MOORE, et al., Plaintiffs/Appellees/Appellants,
v.
CHRYSLER CORPORATION, et al., Defendants/Appellants/Appellees.
No. 23149-CA.
Court of Appeal of Louisiana, Second Circuit.
March 10, 1992.
Writ Denied May 22, 1992.
*227 Leger & Mestayer by Michael J. Mestayer, New Orleans, Chester A. Bradley, III & Assoc. by Chester A. Bradley, III, Thompson, Sparks & Dean by Wood T. Sparks, Monroe, for plaintiffs/appellees/appellants.
Theus, Grisham, Davis & Leigh by Sharon W. Ingram, Monroe, for McAdams Custom Bldg., Inc.
Hayes, Harkey, Smith, Cascio & Mullens by Charles S. Smith, Monroe, for Bill Allen Dodge.
McGlinchey, Stafford, Mintz, Cellini & Lang by Ernest P. Gieger, Jr., New Orleans, for Chrysler Corp.
Before MARVIN, SEXTON and NORRIS, JJ.
NORRIS, Judge.
Sally Moore, a guest passenger in a van, was killed by being ejected through a rear picture window when the van was involved in a one-vehicle accident. Her husband, Dr. Gene Moore, and her three children (including the driver of the van, Liza Pinegar) sued the manufacturer, Chrysler Corp., the seller, Bill Allen Dodge, the customizer, McAdams Custom Building, Inc. *228 ("McAdams"), and their own uninsured motorist and liability insurer, State Farm, alleging the van was defective for failure to have seatbelts on the rear sofa seat and for having a large, easily breakable picture window. The parties filed various incidental claims. Prior to trial, the plaintiffs dismissed their claims against Chrysler without prejudice, and settled with Bill Allen Dodge and State Farm, reserving all rights against McAdams. After trial, the district court wrote long reasons for judgment, finding that the van was defective and that Sally Moore was not at fault in her death. The court assigned fault 20% to Liza Pinegar, 20% to Bill Allen Dodge and 60% to McAdams. The court denied the claims for lost services but awarded damages for wrongful death as follows: Dr. Moore, $150,000; Liza and Philip Pinegar, $75,000 each; and Julia Bailey, $50,000, with all amounts reduced by 40% to reflect the pretrial settlements with other codefendants. Both McAdams and the plaintiffs have appealed.
We conclude the van was indeed defective for lacking seatbelts in the rear sofa seat or a warning not to use that seat while the van is in motion; this defect was a legal cause of Mrs. Moore's death. However, the trial court was plainly wrong to find the van's window was also defective. Because both Bill Allen Dodge and McAdams were equally responsible for the defect, they must share equal fault for the plaintiffs' losses. The trial court was not plainly wrong to assess 20% fault to the driver of the van; fault of 40% each will be assessed to Bill Allen Dodge and McAdams. Because of the pretrial settlements with State Farm and Bill Allen Dodge, the final award will be reduced by 60%. The general damages for wrongful death are within the district court's discretion and will not be disturbed; however, the trial court erred in denying the claim for lost services. The judgment will be amended accordingly, affirmed and rendered.

Background facts
The plaintiffs lived in Monroe, where Dr. Moore, then age 52, is a psychiatrist. He and his wife, Sally Rollins Moore, lived with her children of two prior marriages: Julia Bailey, then 18; Liza Pinegar, then 15; and Philip Pinegar, then 13. This was Dr. Moore's fourth marriage. At the time of the accident Philip was institutionalized at Humana Hospital Brentwood in Shreveport for adolescent psychological problems. However, Philip came home for his birthday weekend and on the evening of April 21, 1985 he was being returned to Shreveport.
Sally Moore drove to Shreveport in the family's customized 1984 Dodge Ram van, which they had bought about a year earlier. The van had two captain's chairs in the front, two high-back captain's chairs in the middle, and a large fold-out bench (sofa) seat in the rear. After the family dropped off Philip, they headed back to Monroe; however, because it was about 11 p.m. and neither Sally nor Dr. Moore had slept much that weekend, Sally asked Liza to drive. Liza was not tired so she took the wheel; she testified she kept a steady speed of roughly 55 m.p.h. Dr. Moore sat in the front passenger seat and Sally went to the sofa seat, at first just leaning over slightly but eventually getting into an almost reclining position, with her feet up on the sofa. Conversation ceased presently and Dr. Moore dozed lightly in his seat.
On an overpass near Gibsland Dr. Moore awoke suddenly; he thought he heard someone (perhaps his wife) say, "We hit something," and he noticed the van was careening across the interstate. He thought he took a brief, sweeping glance toward the rear of the van and "had the impression" that Sally was moving forward, but the van hit something and knocked him forward. Liza had fallen asleep at the wheel and had no recollection of the incident. Dr. Moore reached over and steered the van to a stop on the right (south) shoulder, a short way past the overpass. Dr. Moore and Liza both sustained moderate blows to their heads; Liza started talking irrationally.
A motorist following some distance behind, Tracee Randall, had noticed the van swerve quickly to the left lane and then *229 skid to the right. As it crossed the center line, the witness saw a body appear to "fall" out a side window and land on the pavement. She pulled off the road and woke her husband who, after taking several minutes to calm his wife, got out of the car and walked to the object in the road. It was a woman's body with blood coming out of the mouth and face. She was not breathing. Mr. Randall walked to the van, where he found Liza in shock and Dr. Moore crouched in the back of the van searching for his wife. The large picture window on the driver's side, next to the sofa seat, was smashed out.
State troopers reached the scene at 12:17 a.m. Finding scrape marks on the rails and concrete curbs, they surmised that the van had struck the left (north) guardrail near a small delineator sign, zigzagged across the road and struck the right rail, then traveled 82' before coming to rest on the right (south) side of the road, past the bridge. Sally's body was 68' from the delineator sign. Blood on the sign suggested that she struck it and was deflected into the road. Blood spots on the highway suggested that her body may have bounced on the pavement before coming to rest on the centerline, the head facing west.

Construction of the van
Dr. Moore had bought the van new from Bill Allen Dodge in Monroe in May 1984. Bill Allen Dodge, in turn, had received the van from Chrysler a few months earlier as a "shell," its interior consisting of only two front seats and bare metal to the back. A "shell" van is suitable for converting, but Bill Allen Dodge did not perform this work. The relationship between Bill Allen Dodge, the customizer and the ultimate buyer was the subject of much testimony.
Wesley Pleasants is a carpenter and cabinet maker with some experience making camper shells. In about 1973 he started converting vans for friends; his then father-in-law, Mr. Bill Allen Sr. (former president of Bill Allen Dodge) asked him to come to Monroe and convert vans for the company in 1976. At that time Mr. Allen's son, Lane Allen, gave Pleasants some instruction in safety techniques, but nothing very detailed. Another Bill Allen Dodge employee, Bill Nevins, showed Pleasants how to customize with a kit. Pleasants did not attend any schools or join any associations; he testified he had heard of the Federal Motor Vehicle Safety Act ("FMVSA") but he did not know its content. Eventually Pleasants went into business for himself, doing conversions for Bill Allen and others, but at no time did Bill Allen supervise his work.
Because business was slow, Pleasants went to work for Glen McAdams, owner of McAdams Custom Building, in 1983. McAdams did building construction and he knew nothing about van conversions or the FMVSA; he testified he hired Pleasants because "his work was good." He allowed Pleasants to call his end of the business "VanFare, Division of McAdams Custom Building Inc." VanFare would not convert a van except by request from a customer like Bill Allen Dodge or an individual.
According to Pleasants, if an order did not mention seatbelts, he would discuss this with the customer. He wanted to install as many belts as possible because he made about $12 per seat (and added about $30 per seat to the final price). He testified, however, that Bill Allen's position was to keep down the price as much as possible so his vans would be competitive, and most of the time Bill Allen did not add belts to the seats he ordered installed. Bill Allen Sr. testified he would not turn down a sale because seatbelts were requested. Pleasants knew that if he installed a seat without a belt, he should place a warning sticker advising passengers not to use the seat while the vehicle is in motion.
Pleasants was hired to customize the van that Dr. Moore eventually bought. He installed the two middle captain's chairs and the rear sofa seat. As Bill Allen's purchase order did not specify seatbelts, Pleasants did not attach any to the seats he installed. He affixed a sticker identifying the customizer as VanFare. He also cut five spaces in the sides of the van using window templates from a kit (it was only the second or third time he had used this *230 particular kit). The rear driver's side window was large, 34" wide by 24" high, and its bottom was almost flush with the top of the sofa seat. The window's frame came in the kit; Pleasants cut the frame into six sections which were not contiguous when installed, but he riveted each segment in three or four places. For the window pane he used a plate of AS3 glass, the kind ordinarily used in side windows. Pleasants's project also included carpet, drink stands and other accessories.
The total cost of VanFare's work for Bill Allen was $1,787.70. The customized van cost Dr. Moore $21,950.

Safety requirements
The parties secured expert witnesses to describe and discuss federal safety regulations affecting all motor vehicles and Dr. Moore's van. One of the plaintiffs' experts, Mr. Gene Moody, was accepted as a civil and structural engineer with emphasis in vehicular accident reconstruction. Another of plaintiffs' experts, Dr. Lawrence Daniel, a retired professor of mechanical engineering at LSU, was accepted in that field and in automotive engineering. McAdams's expert, Mr. Richard Fay, was accepted as an expert in motor vehicle accident reconstruction and mechanical engineering.
All experts testified that under federal regulations, every seating position in a motor vehicle must have a passenger restraint device; rear seats, such as the sofa seat in Dr. Moore's van, must have at least two seat belts. 49 C.F.R. § 571.208. Dr. Daniel added that each seatbelt must be mounted to withstand 5,000 lb. of force in a standardized test. 49 C.F.R. § 571.210. Seats not designated for occupancy while the vehicle is in motion must be conspicuously labeled to that effect. 49 C.F.R. § 571.207. All experts agreed that the complete absence of seatbelts in the rear sofa seat was a violation of these standards. Mr. Moody cited statistics that the chance of fatal ejection are at least a hundred times greater for a person not wearing a seatbelt. The experts noted that the Chrysler owner's manual did not recommend wearing a seatbelt in a reclining position on a bench seat, but Mr. Moody said a person may do so and be protected against ejection.
The experts also testified that front windshield glass must hold in an unrestrained body in a 30-m.p.h. head-on collision. 49 C.F.R. § 571.212. An industrial association, the Society of Automotive Engineers ("SAE"), has certified that a grade of glass called "AS1" satisfies this standard; AS1 glass has a plastic membrane for added retention. The federal standards, however, do not dictate glass for use in side windows; according to Mr. Moody, SAE requires a grade of glass called "AS3," which is tempered so that on impact it shatters into small, blunt pieces that reduce the risk of laceration. Mr. Fay testified that because AS3 glass is tempered, it is actually stronger, but because it lacks the membrane it does not retain as well as AS1 glass. Mr. Fay conducted some very graphic tests (videotaped and admitted as Exhibit D-27) showing that a pane of AS1 glass shatters when impacted by a person Sally Moore's size at a speed of only 9 m.p.h. All experts agreed that the use of AS3 glass in the side window complied with federal and SAE standards.
Dr. Daniel felt that the segmented frame diminished the overall strength of the window but he cited no authority for this and could not quantify the diminution. Mr. Fay's tests included a controlled smashing of glass in a more rigid frame; he testified that such a frame would not greatly improve the strength of the glass.
Finally, Dr. Daniel testified that under federal regulations, when a customizer alters a certified vehicle, he must affix a label warranting that his alterations comply with all federal safety standards. 49 C.F.R. § 567.7. All experts agreed that the VanFare sticker did not meet this requirement. Mr. Fay testified that the customizer, not the seller, had the duty to assure that the customized van complied with safety standards.

Dynamics of the accident
Using the observations and measurements of the State Police, the experts reconstructed *231 the accident. Mr. Moody visited the accident site, made his own measurements and took photographs; he examined DOTD drawings and a NASA aerial photograph of the scene; and he prepared several diagrams showing the van's probable location at various phases of the accident. He testified that the "W"-shaped metal guardrails in place on this overpass are designed to redirect a straying vehicle smoothly into the lane, and not send it into a spin. He felt that Liza inadvertently allowed the van to drift to the left guardrail at a gentle angle of 20°; it struck the rail and exited at 15°. The impact, which lasted only .21 second, slowed the van by 20 to 30 m.p.h. (he called this the "delta-v"). The van slowed but Sally Moore's unrestrained body did not; inside the van it continued moving almost 55 m.p.h. in a forward direction, slightly toward the left. Because the van moved to the right, her body struck the back of the rear driver's side captain's chair. She caromed off this and struck the picture window at a speed of 20 to 30 m.p.h.; at this point the van was traveling 25 to 35 m.p.h. in a direction diagonal to her own.
Mr. Fay reviewed the police reports and photos, and the various depositions; because the actual overpass on which the accident occurred had been razed and rebuilt, he closely examined a similar overpass about six miles away; he reviewed DOTD drawings; and he prepared a videotape to illustrate his reconstruction of the accident. He felt that Liza must have actually struck the right guardrail first (the impact when Sally Moore reportedly said, "We hit something"), sending the van into a spin; the side of the van struck the left guardrail and Sally was ejected "almost laterally" through the window. He estimated that Sally's body was sailing 38 m.p.h. when it struck the window, though the van itself was moving much slower (it underwent a greater delta-v). Mr. Fay assumed that Sally got up from the sofa seat and started toward the front of the van when the first impact occurred (this would explain Dr. Moore's perception that she was "coming forward"); however, he conceded that if she was very far from the sofa upon second impact, she could not have hit the window. He also conceded that if the forward (east) vector were great enough, Sally would have bounced off the rear driver's side captain's chair and struck the window, just as Mr. Moody hypothesized.
The trial court rejected Mr. Fay's reconstruction theory, largely because the eyewitness did not recall seeing the van spin in the road, and because this theory was not as lucid as Mr. Moody's. We would note, however, that in crucial respects the theories are compatible. They agree that upon impact with the left (north) guardrail, significant forward and lateral forces propelled Sally's unrestrained body toward the window at a fairly high speed.
All experts also agreed that if a seatbelt had been available on the sofa seat and Mrs. Moore had been using it, it would have restrained her and she could not have been ejected from the window. Their conclusions as to the window, however, were ambivalent. Mr. Moody testified that AS1 glass may have restrained her to some extent but not fully; he also felt that a better frame would have slowed her more, but not kept her in. He suggested that an armrest or a safety bar might have kept her in, but these probably would only have prolonged her ejection. Dr. Daniel also testified that AS1 glass in this window would have kept her in longer, and would not have broken if she hit it traveling 30 m.p.h. or less. He felt the window lacked structural support, was too large and placed too low, thus enhancing the risk that a passenger might slide out. He admitted, however, that Mrs. Moore probably did not slide out but was thrown, and she first struck the left side of the frame, which did not break. Mr. Fay testified that at the speeds Mrs. Moore and the van were traveling, even AS1 glass in a very rigid frame would not have restrained her. He added that a window divider bar substantially weakens a window.

Action of the trial court and issues on appeal
The matter went to a bench trial that concluded on April 13, 1989. The trial *232 court released its reasons for judgment over a year later, on June 11, 1990. The court had little difficulty finding that the lack of seatbelts on the sofa seat, and the absence of a warning to that effect, were violations of federal safety standards and made the van unreasonably dangerous for its normal use. The court concluded that Mrs. Moore's death resulted from this condition, and that both Bill Allen Dodge and McAdams must "bear and share" responsibility for it. The court then said the seatbelt issue was "problematical" as it was "speculative" whether Mrs. Moore would have used a seatbelt if it was available. Thus the court felt impelled to examine the overall crashworthiness of the van. With some difficulty, the court concluded that the composition, frame, placement and size of the window made it, too, defective.
The court then considered the relative negligence of the parties. The reasons here are not a model of clarity. Liza Pinegar was negligent for falling asleep at the wheel, but her brush with the guardrail did not cause the enhanced injury, Mrs. Moore's death; instead, the death resulted from the defects of the van. Despite the initial finding that Liza Pinegar was not at fault in the death, the court proceeded to find that Liza's negligence could not be imputed to Dr. Moore, who was not guilty of independent negligence. The court did not specifically exculpate Mrs. Moore from negligence for allowing Liza to drive. However, applying the rationale of Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985), the court found that comparative negligence should not be assessed against either Mrs. Moore or Liza Pinegar.
The court then turned to the fault of Bill Allen Dodge and McAdams. Even though the seller owed a duty of reasonable inspection of the thing sold, and even though Bill Allen Dodge selected its customizer, decided to forgo seatbelts and did not call this to the buyer's attention, the court considered Bill Allen Dodge's fault to be considerably less than McAdams's. The court apportioned fault 60% to McAdams, 20% to Bill Allen Dodge and 20% to Liza Pinegar (in spite of the earlier suggestion that Liza's conduct was not even the cause-in-fact of Mrs. Moore's death and the express rejection of comparative fault).
The court awarded general damages for wrongful death as follows:

Dr. Moore $150,000.00
Philip Pinegar 75,000.00
Liza Pinegar 75,000.00
Julia Bailey 50,000.00

The court denied the claim for lost income, citing a lack of evidence that Mrs. Moore would ever have worked for income again. As for lost services, the court found no evidence that the plaintiffs actually sustained any financial loss to replace Mrs. Moore's services. The court also noted that Dr. Moore remarried within five months of Sally Moore's death; though subsequent remarriage cannot be urged to defeat a claim for the wrongful death of a spouse, the court felt that recent amendments to La.C.C. art. 2315 placed the claim of services outside the realm of emotional damages and remarriage may now bar the financial claim of lost services. The rest of the court's reasons addressed special damages not contested on appeal.
The general damages were subject to reduction by 40% for the fault of Bill Allen Dodge and Liza Pinegar. The judgment recites that the reduction is for "pre-trial settlements with other co-defendants," who would be Bill Allen Dodge and State Farm, Liza's liability carrier.
McAdams has appealed suspensively, urging:[1]
(1) The trial court erred in accepting the testimony of Dr. Daniel with no supporting evidence while disregarding the tests performed by Mr. Fay;
(3) The trial court erred in finding that Liza Pinegar's action was not the cause-in-fact of Mrs. Moore's death;
(4) The trial court erred in finding that Mrs. Moore's own conduct was not a cause-in-fact of her death; and
(5) The trial court erred in assigning only 20% fault to Liza Pinegar and no fault to Dr. and Mrs. Moore.
*233 The plaintiffs have appealed devolutively. First arguing the trial court correctly determined McAdams's liability, they assign as error:
(2) The trial court incorrectly reduced the plaintiffs' awards under the guise of comparative negligence;
(3) The general damage awards are inadequate to compensate the victims for their losses; and
(4) The trial court improperly excluded loss of services and/or loss of support damages.

Discussion: Defect of the van
By its first assignment, McAdams argues the van was not defective; in particular, Mr. Fay's tests and explanations undermine the finding that the window is unreasonably dangerous for its normal use. The plaintiffs urge by their first assignment the trial court was not clearly wrong in rejecting Mr. Fay's theories and finding the van defective. The standard of review is manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
At the time this accident occurred, the Louisiana law of products liability was set out in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986).[2] There the court restated extant caselaw and summarized it in "classifications of unreasonably dangerous products." The first two classes, "unreasonably dangerous per se" and "unreasonably dangerous in construction or composition" are not applicable to the case and will not concern us here.
The third class of defective products includes those which, though not unreasonably dangerous per se or flawed by an unintended construction defect, are still unreasonably dangerous because the manufacturer fails to warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product that is not within the knowledge of, or obvious to, the ordinary user. Id., at 114-115; Bloxom v. Bloxom, 512 So.2d 839 (La.1987); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978).
The fourth class includes products that are unreasonably dangerous in design. This form of defect may be proved any of three ways: (1) a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product (this is the design equivalent of a product that is unreasonably dangerous per se); (2) although the product is not unreasonably dangerous per se, alternative products were available to serve the same needs or desires with less risk of harm; or (3) although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. Halphen, supra at 115.
The first defect the trial court found was the lack of any seatbelts on the sofa seat. The evidence is overwhelming that this is a defect in design. While there is no such thing as a crash-proof car, carmakers owe the duty to make cars reasonably safe in the event of a crash. The three experts agreed that personal injury from ejection or "second collision" inside the vehicle is precisely the type of harm that seatbelts are intended to reduce; if a seatbelt had been available, and Mrs. Moore had used it, it would have restrained her in this accident and reduced her bodily injury to a mild or moderate level. Federal law and regulations mandate their use in all motor vehicles. 15 U.S.C. § 1410b; 49 C.F.R. §§ 571.208-210. As if more proof were needed, common sense dictates that adding a seatbelt is a simple and feasible way to design a car with less risk of harm. Bill Allen Dodge ordered, and McAdams installed, a seat without this basic safety device. They are liable for a defect in design.
*234 The experts also established that while a manufacturer might not equip every location in a motor vehicle with seatbelts or other passenger restraints, any seat not so equipped must be clearly labeled to that effect. Federal standards have adopted this position with the "Not A Seat" notice requirement. 49 C.F.R. § 571.207. The risk of ejection from the vehicle or second collision inside it, though real, is probably abstract to the average driver or passenger, thus explaining the need for the notice. The notice corresponds precisely with the duty to warn as stated in Halphen. McAdams produced, and Bill Allen Dodge requested and sold, the van without this basic warning on a seat unequipped with restraint devices. They are liable for a defect for failure to warn.
The thrust of McAdams's argument is that even if a seatbelt had been present, or if the warning had been posted, Mrs. Moore would have left the seatbelt unused or ignored the warning, because it was her intent to lie down on the sofa seat. Since she was going to lie down anyway, McAdams reasons, there is no causal connection between the omissions and the Mrs. Moore's death. Without so holding, the trial court expressed doubt whether Mrs. Moore would have used a seatbelt or heeded a warning.
The law, however, allocates the burden of proof in a failure to warn case. In Bloxom v. Bloxom, supra, the Supreme Court stated:
Once a plaintiff proves that the lack of an adequate warning or instruction rendered the product unreasonably dangerous, his cause of action is assisted by a presumption: when a manufacturer fails to give adequate warnings or instructions, a presumption arises that the user would have read and heeded such admonitions. Benoit v. Ryan Chevrolet, 428 So.2d 489, 493 (La.App. 2d Cir.1983 [1982]); * * *. The presumptions, however, may be rebutted if the manufacturer produces contrary evidence which persuades the trier of fact that an adequate warning would have been futile under the circumstances. 512 So.2d at 850.
To exculpate itself, McAdams had to show that Mrs. Moore would not have acted on a warning. It can be noted superficially that once Liza and Dr. Moore took the front captain's chairs, there was no other seating position in the van equipped with seatbelts, and thus no way Mrs. Moore could have acted on a warning. However, the lack of other seats with seatbelts is a result of the defendants' improper design and cannot be urged to absolve them of the failure to warn. Based on the presumption of Bloxom v. Bloxom, it is reasonable to conclude that if either Mc-Adams or Bill Allen Dodge had advised the Moores of the defect of the van, the Moores would have heeded the warning by correcting the defect. In fact, Wes Pleasants testified that customers sometimes returned vans that he had customized, when they realized that seatbelts were missing. R.p. 824. The fact is that McAdams did not post the notice, and Bill Allen Dodge did not advise the Moores of the condition of the van and this failure is reasonably connected to the harm ultimately sustained.
Contrary to McAdams's contentions, the record shows that Mrs. Moore generally used the seatbelt whenever she drove the van. R.pp. 859, 937. There is no record evidence to suggest she would do otherwise when riding as a passenger. Also contrary to McAdams's argument, it is not at all plain from the record that Mrs. Moore actively chose to eschew seatbelts and warnings; she did not declare she was going to lie down. With her history of using seatbelts, it can be assumed that she would have used an available seatbelt and, thus restrained, would not have completely reclined. She also could have lain down with the seatbelt on, as Mr. Moody found was possible. Moreover, the presumption applied in Bloxom suggests that Mrs. Moore would have used an available seatbelt. In sum, the record does not overcome the presumption that Mrs. Moore would have heeded a proper warning, or the testimony that she would have used an available seatbelt. The trial court was not plainly wrong to find a defect in design and *235 failure to warn with respect to the seatbelts, and to find this a legal cause of Mrs. Moore's death.
The second alleged defect, the window, is far more problematical. The trial court broached this issue, apparently, out of concern that Mrs. Moore would not have used an available seatbelt; however, as we have noted, this concern is not soundly based. Nevertheless we have closely reviewed the evidence as to the window. There is no hint in the record that a manufacturer is required to or should place warnings on window glass. Likewise, there is no indication that the instant window was unreasonably dangerous per se, that the AS3 glass in place was defective AS3 glass, or that the segmented frame was unintentionally (from McAdams's standpoint) abnormal. The window does not fall into the first three classes of defective products outlined in Halphen.
The facts over which the trial court labored were design choices: AS3 glass instead of AS1, a segmented frame instead of a continuous frame; removal of a structural element in the wall; and placement of the window too low. The court implicitly found that by changing some or all of these characteristics, McAdams could have feasibly produced another design with less harmful consequences.
Dr. Daniel testified that a segmented frame is weaker than a continuous one. He performed no tests and did not say how much stronger a continuous frame would have been; he admitted this would be "hard, very hard to calculate." R.pp. 1169, 1185. Mr. Fay agreed that a more rigid frame would enhance the strength of the whole window, but by no more than 1 m.p.h. in a crash test. R.p. 1279. The photos in evidence, notably Ex. P-3(I), (J) and (K), show conclusively that the frame did not fail, even though a violent impact is evident. Mr. Moody testified that a better frame would have slowed Mrs. Moore's body but not held her in. R.p. 1076. No one estimated the detriment from cutting the structural member.
Mr. Moody suggested that the window was placed too low; Dr. Daniel added that locating the window higher would have increased its strength. R.pp. 1077, 1178-1179. However, Mr. Moody admitted that Mrs. Moore's body did not slide out the window, and the photos show that the brunt of the force was halfway up the middle of the left side of the window.
As for the grade of glass, all experts agreed that the AS3 glass in place was proper for a side window. Mr. Fay testified AS3 is actually stronger than AS1; Dr. Daniel conceded AS1 is weaker but more retentive. R.pp. 1276, 1186. Mr. Moody would not say that AS1 glass would have fully retained Mrs. Moore's body in this accident. R.p. 1075. Mr. Fay testified that AS1 glass would not have kept her in. R.p. 1320. According to Dr. Daniel, it was "hard to say" whether AS1 glass would have prevented ejection in this accident, but he stated that if she had been traveling only 30 m.p.h. and struck a properly mounted pane of AS1 glass, he "didn't think" she would have been ejected. R.pp. 1176-1177.
The upshot of this evidence is that AS1 glass in an ideal frame could be expected to retain an unrestrained body at no more than 30 m.p.h. Mr. Moody estimated that Mrs. Moore's body was traveling 20-30 m.p.h. when it struck glass in a van traveling 25-35 m.p.h. Mr. Fay placed the speed of the body at 38 m.p.h. when it impacted a window in a van traveling much slower. The trial court found that Mrs. Moore's body was moving at a speed "in excess of 35 m.p.h." when it hit the window. By any theory, the force involved is far greater than the 30 m.p.h. head-on crash that the best proposed window could withstand. The segmented frame did not fail. The point of impact shows that placing the window several inches higher would not have blocked the body's exit, and even a much smaller window would not have prevented ejection. The evidence does not demonstrate a feasible way to design the window with less harmful consequences. The trial court's finding to the contrary is clearly wrong.
None of this is to say that windows need not meet safety standards. The evidence easily shows that windows must have a *236 component of crashworthiness. However, the best government and industry standards for windows do not make them a substitute for passenger restraints such as seatbelts. No one disputed the need or desirability of windows in vans. Given the high speed and dynamics of this accident, even the safest window proposed would have had fatal consequences for an unrestrained passenger. The absence of seatbelts and the related failure to warn were the only proven defects of this van.

Fault of Dr. & Mrs. Moore
By its fourth assignment McAdams urges the trial court erred in finding that Mrs. Moore's own negligence was not a cause-in-fact of her death; by its fifth assignment McAdams contests the court's failure to assign any fault to her or Dr. Moore. The argument is that Dr. and Mrs. Moore were negligent for permitting the young, inexperienced driver Liza Pinegar to take the wheel, especially late at night after a statutory curfew. La.R.S. 32:416.1 provides:
It shall be unlawful for any child who is less than seventeen years of age to drive a motor vehicle or a power cycle upon any highway, street, public road, or public thoroughfare at any time between 11 p.m. and 5 a.m. on Monday through Thursday, and between 12 o'clock midnight to 5 a.m. on Friday through Sunday.
See also State in Int. of Bogan, 250 So.2d 191 (La.App. 1st Cir.1971).
Liza Pinegar was 15 years and 9 months old in April 1985, thus placing her under this statutory curfew. The Moores left Shreveport about 11:00 p.m. on a Sunday night. The accident occurred near Gibsland, less than an hour away; the police received the call at 12:09. In light of these facts, McAdams did not prove that the driving and accident occurred before curfew began at midnight. No violation of the statute was proved.
Moreover, this is not a situation where someone let an unlicensed minor drive a vehicle, as in Snyder v. Bergeron, 501 So.2d 291 (La.App. 1st Cir.1986), writ denied 503 So.2d 483 (1987), relied on by McAdams in brief. Snyder reaffirms traditional jurisprudence that violation of a safety statute is negligence if the risk and harm encountered by the plaintiff fall within the scope of the protection of the statute. Dixie Drive It Yourself Syst. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). In Snyder the court of appeal had little difficulty reasoning that statutes requiring licensing and driver training are designed to protect the motoring public by preventing inexperienced and incapable persons from driving. A 15-year old licensed driver, Bergeron, let an unlicensed 14-year old, Price, drive Bergeron's father's van, even though Bergeron knew that Price had been speeding earlier in the evening. Price was later killed in a one-vehicle accident. The court of appeal found Bergeron 20% at fault in Price's death, as he should not have let an unlicensed (and obviously inexperienced) youth drive. The court also stated:
Nevertheless, if * * * Price, despite his age, was a competent and experienced driver, then we believe that this particular risk was outside the scope of the risks in question. There would be no breach because the scope of the duty to keep inexperienced minors from driving necessarily does not include the risks associated with letting an experienced minor drive. Experienced drivers manage to engage themselves in auto accidents all the time. 501 So.2d at 295 (emphasis added).
See also Frain as Tutrix of Beason v. State Farm Ins. Co., 421 So.2d 1169 (La. App. 2d Cir.1982).
With reference to La.R.S. 32:416.1, we would add that 15- and 16-year olds are no more prone to falling asleep at the wheel than older drivers, and a well-rested person of any driving age is probably less prone than a fatigued one. Even if Dr. and Mrs. Moore had violated the statute by letting Liza drive after curfew, the proper analysis would be whether the risk of Liza falling asleep at the wheel was encompassed by the duty. The trial court found that it was not.
*237 Dr. Moore testified that both he and his wife were tired, not having slept much that weekend, while Liza appeared alert. Dr. Moore, who is very keen against drinking and driving, did not want to drive because he had taken a drink earlier. He did not consider Liza an unsafe driver and did not notice anything unsafe about her driving before he dozed off. Liza verified that she was not tired when they left Shreveport. She had got her driver's license about nine months earlier; both she and her sister had a family-imposed curfew of midnight or 11 p.m. when they were out alone. Admittedly, Liza had not done much night driving and she was not the primary operator of the van. On the other hand, a straight stretch of interstate during light traffic hours is not an unreasonable assignment for a younger driver. There was nothing in Liza's conduct to suggest she was at risk for dozing off.
Given all these circumstances, the trial court did not consider Dr. Moore's conduct an independent basis of negligence, and this finding is not plainly wrong. The same rationale applies to Mrs. Moore; she was not negligent for letting Liza drive. These assignments lack merit.

Fault of Liza Pinegar
By their second assignment the plaintiffs urge the trial court erred in reducing their awards under the guise of comparative negligence. Conversely, McAdams urges by its third assignment that the trial court erred in finding that Liza Pinegar's conduct was not the cause-in-fact of Mrs. Moore's death and not reducing the award accordingly.
Each litigant's respective perception of the trial court's statements about Liza's negligence undoubtedly arises from the lack of clarity of the reasons for judgment. Appeal lies from the judgment itself, not the reasons therefor. Hardin v. Munchies Food Store, 510 So.2d 33 (La. App. 2d Cir.1987), and citations therein. However, some discussion of comparative fault and enhanced injury is essential to understand the judgment.
Every driver has the duty to maintain reasonable and proper control of her vehicle while operating the vehicle. La.R.S. 32:58; Foster v. Lafayette Ins. Co., 504 So.2d 82 (La.App. 2d Cir.), writs denied 505 So.2d 61, 65 (1987). She is negligent if she allows her car to run off the roadway. Gadman v. State through DOTD, 493 So.2d 661 (La.App. 2d Cir.), amended on other grounds 497 So.2d 1001 (1986); Rochelle v. State through DOTD, 570 So.2d 13 (La.App. 3d Cir.1990), writ denied 572 So.2d 93 (1991). Because the collision could not have occurred without Liza Pinegar's negligence, this negligence was the cause-in-fact of the accident. Dixie Drive It Yourself Syst., supra.
The plaintiffs' position on appeal, that Liza Pinegar's negligence cannot be a legal cause of the enhanced injury of death, is not tenable. The theory of enhanced injury holds that the manufacturer is liable for the additional injuries resulting from the vehicle's defective design, even if the defect that caused the injuries to be enhanced was not the cause of the initial accident. See, e.g., Seese v. Volkswagenwerk A.G., 648 F.2d 833 (3d Cir.1981); Perez v. Ford Motor Co., 497 F.2d 82 (5th Cir.1974); Huff v. White Motor Corp., 565 F.2d 104 (7th Cir.1977); Stahl v. Ford Motor Co., 64 Ill.App.3d 919, 21 Ill.Dec. 667, 381 N.E.2d 1211 (3d Dist.1978).
Our brethren of the Fifth Circuit Court of Appeal have recognized the theory of enhanced injury in Boubel v. Gilardi, 532 So.2d 948 (La.App. 5th Cir.1988). There the plaintiff's daughter was driving drunk when her Camaro had a collision with another car; the impact caused the Camaro to overturn and land upside down in a drainage canal. Although the plaintiff's daughter was wearing her seatbelt, it came loose in the impact, allowing the woman to be swept out of the seat and the car itself by the swift current in the canal. She drowned, lodged between the sprung hood and the windshield. In addition to other defendants, the plaintiff joined General Motors on the theory that the Camaro's seat and seat belt were defective for letting her be washed out of the car. GM filed an *238 exception of no cause of action, urging that the allegedly defective condition of the Camaro was not a cause of the accident and thus could not be liable for the damages. The trial court sustained the exception.
The court of appeal reversed, citing Weber v. Charity Hosp. of La., 475 So.2d 1047 (La.1985), and holding that a cause of action exists not only against one tortfeasor for the initial accident, but also against a "subsequent tortfeasor for aggravation of the original injury," regardless of whether the subsequent tort caused the initial accident. Thus the exception of no cause could not be sustained in favor of GM.
This conclusion, however, does not by any means absolve the initial tortfeasor of responsibility. The court in Boubel stated that the plaintiff's daughter may have been at fault in causing the initial collision and this fault would operate to reduce her recovery in accord with La.C.C. art. 2323. In Weber v. Charity Hosp., supra, the Supreme Court expressly held that the duty of the host driver to refrain from causing injury to another by the negligent operation of her vehicle encompasses the risk that the tort victim's injuries might be worsened by the treatment for those injuries. Liza Pinegar's duty to stay on the road and avoid injuring others likewise encompassed the risk that her passenger's injuries might be worsened because of a defect in the van. She cannot be absolved of responsibility just because someone else's fault served to worsen the injury.
We also note that the record evidence does not support the assertion that but for the lack of seatbelts, Mrs. Moore would have escaped injury. Liza Pinegar and Dr. Moore, seated in the front captain's chairs, were wearing seatbelts and they still sustained moderate injuries. There is no evidence to show how severe Mrs. Moore's injuries would have been with proper seat belts. Cf. Stahl v. Ford Motor Co., supra. Moreover, the award is for wrongful death, which is a separate cause of action from the survival action for Mrs. Moore's own pain and suffering. Callais v. Allstate Ins. Co., 334 So.2d 692 (La.1975). While it may be possible to divide a personal injury award between initial and enhanced components, we could not say that a person's death was enhanced; death does not appear to be divisible. See General Motors Corp. v. Edwards, 482 So.2d 1176 (Ala. 1985).
The plaintiffs also cite the case of Bell v. Jet Wheel Blast, supra, which holds that comparative fault may be applied in certain categories of cases to reduce the plaintiff's recovery. The court stated:
Where the threat of a reduction in recovery will provide consumers with an incentive to use a product carefully, without exacting an inordinate sacrifice of other interests, comparative principles should be applied for the sake of accident prevention. The recovery of a plaintiff who has been injured by a defective product should not be reduced, however, in those types of cases in which it does not serve realistically to promote careful product use or where it drastically reduces the manufacturer's incentive to make a safer product. 462 So.2d at 171-172.
The court declined to apply comparative negligence to the plaintiff in Jet Wheel Blast by considering various factors: he was performing a repetitive operation with a defective industrial machine as required by his employer, and his conduct was only ordinary negligence; the machine's chain and sprocket drive lacked a guard which would have prevented the kind of injury sustained; and to reduce the plaintiff's award would tend to reduce the manufacturer's incentive to make a safer product.
These factors, while illustrative, cannot be mechanically intoned to bar comparative fault from all types of products liability cases. A product must be reasonably safe to normal use and misuse. Bloxom v. Bloxom, supra. As noted, Liza Pinegar had the statutory duty to maintain reasonable and proper control of her vehicle while operating the vehicle. La.R.S. 32:58. Although straying off the paved roadway may be a normal misuse, the driver who does so is negligent. Gadman v. State through DOTD, supra; Rochelle v. State through DOTD, supra. Had it not *239 been defective, the machinery in Jet Wheel Blast would not have caused the plaintiff any harm; however, in even an ideally designed van, Liza Pinegar's conduct would have caused some injuries. We feel that comparative principles are better served by applying comparative fault to the instant case. This affirms the manufacturer's duty to make the automobile reasonably safe while not diluting the driver's duty to exercise ordinary caution. The trial court was not plainly wrong, in the judgment, to reduce the plaintiffs' recovery for the fault of Liza Pinegar. The plaintiffs' second assignment lacks merit. Because the trial court did reduce the recovery, McAdams's third assignment also lacks merit.

Allocation of fault
With the finding that Liza Pinegar, Bill Allen Dodge and McAdams were all at fault in causing Mrs. Moore's death, we now review the allocation of fault, which McAdams addresses in its fifth assignment of error.
Louisiana has a pure comparative fault system. La.C.C. arts. 2323, 2324. In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985), the Supreme Court suggested the following factors in comparing the fault of plaintiffs and defendants:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a danger was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. 469 So.2d at 974.
The trial court assessed 20% fault to Liza Pinegar, a plaintiff, and 80% to the defendants. It is obvious that Liza Pinegar's conduct was strictly inadvertent, whereas the defendants consciously requested, constructed and sold the van with a defect. There were no extenuating circumstances to justify the defendants' conduct. The failure to install seatbelts posed a danger that has been recognized by federal enactment; Liza Pinegar's conduct also posed a danger to her passengers and to the general public. Under the circumstances, we cannot say the trial court was plainly wrong to allocate 20% fault to Liza Pinegar and to reduce the plaintiffs' recovery by that amount.
As between the defendants, the trial court assessed three times as much fault to McAdams as to Bill Allen Dodge, presumably because the court considered McAdams alone to be responsible for the condition of the window. However, for the reasons already expressed, the window was not defective, and we have reconsidered the defendants' responsibility for the lack of seatbelts or warnings. Both knew that customizing a van without rear seatbelts created an unreasonable risk of harm. Neither worked inadvertently or under conditions of haste. Bill Allen Dodge controlled the relationship with McAdams, in effect ordering McAdams to make a defective product which could be remedied only at McAdams's expense. However, McAdams's own expert, Mr. Fay, testified that the customizer bears the ultimate duty of assuring compliance with federal regulations. Under these circumstances, the trial court erred in assessing only 20% fault to Bill Allen Dodge. The judgment will be amended to reflect 40% each to Bill Allen Dodge and McAdams.
The plaintiffs executed pretrial settlements with State Farm and Bill Allen Dodge. The awards will therefore be reduced by 60%, to reflect these parties' portion of the obligation. La.C.C. arts. 1803, 3071.

Quantum
By their third assignment the plaintiffs urge the general damages are inadequate to compensate the victims for their losses. By their fourth assignment they urge the trial court improperly excluded damages for loss of services or loss of support.
Damages may include loss of consortium, service and society. La.C.C. *240 art. 2315. In the assessment of damages in cases of offenses, quasi offenses and quasi contracts, much discretion must be left to the judge or jury. La.C.C. art. 2324.1; Emerson v. Empire Fire & Marine Ins. Co., 393 So.2d 691 (La.1981); Coco v. Winston Indus. Inc., 341 So.2d 332 (La.1977). Evidence of a surviving spouse's remarriage is generally inadmissible to mitigate damages for the wrongful death of a spouse. McFarland v. Illinois Central R. Co., 241 La. 15, 127 So.2d 183, 87 A.L.R.2d 246 (1961); Lofton v. Cade, 359 So.2d 1074 (La.App. 3d Cir.), writ denied 360 So.2d 1177 (1978); Hightower v. Dr. Pepper Bottling Co. of Shreveport, 117 So.2d 642 (La.App. 2d Cir.1959). Loss of future support may include the earning capacity of the victim as well as the actual lost earnings. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Lost earnings need not be precisely proven but they must be shown with reasonable certainty. Thomas v. State Farm Ins. Co., 499 So.2d 562 (La. App. 2d Cir.1986), writs denied 501 So.2d 213, 215 (1987); Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985).
Mrs. Moore was a high school graduate with a few college credits at Indiana State and NLU. She was working as a secretary when she and Dr. Moore met and married; since then she had not worked for wages outside the home. She occasionally helped out at her husband's office when they were "in a tight." Liza Pinegar testified that her mother did a lot of charity work and church functions. Julia Bailey, the elder daughter, testified that her mother had spoken of returning to college and perhaps becoming a teacher or a writer, but she admitted these were not concrete career plans. On these facts it is not more probable than not that Mrs. Moore would have ever returned to the workplace. The trial court was not plainly wrong to deny the claim for future lost earnings as too speculative to justify an award.
The question of lost services is more complex. In Marceleno v. State Dept. of Highways, 367 So.2d 882 (La.App. 2d Cir.1978), writ denied 369 So.2d 1364 (1979), this court recognized that the testimony of experts such as economists as to the value or cost of replacement of household services has value to the trier of fact in the almost imponderable task of assigning a dollar amount to the amount of the survivors' loss. Id., at 889. In the instant case the plaintiffs themselves laid a foundation by offering limited testimony about the kind of services Mrs. Moore provided around the house. Both sides called expert economists. The plaintiffs' expert, Dr. Ernest Moser of NLU, valued the wife's services at minimum wage and figured that the loss from the date of Mrs. Moore's death until trial was $27,662.96 to $55,325.92, depending on how many hours a week she would work for the family. He also testified that Mrs. Moore had a life expectancy of 37.03 years when she died; from the date of trial to the end of her life expectancy, her lost services would have a present value of from $154,530.26 to $309,060.52. These figures do not reflect any offset for Mrs. Moore's own personal maintenance. R.pp. 986-989.
McAdams's expert, Dr. Jerry Hood of Nicholls State University, testified that the average housewife with two children in the home would work 52.1 hours per week. He figured the value of past lost services at $30,625.54. He testified that future lost services should be based on Dr. Moore's life expectancy of 22.8 years, reasoning that he would sustain the loss only for the duration of his own life. Using a replacement cost approach, Dr. Hood fixed future services at $77,606.21. He felt, however, that Mrs. Moore would have consumed services worth $120,585.63, meaning there was no net loss. R.pp. 1220-1221.
At the outset we must address the trial court's studious but flawed attempt to dismiss this portion of the claim. Traditionally, a surviving spouse's claim for lost services was included in the general damage award for wrongful death. See Dixon v. Mid-South Rail Corp., 580 So.2d 438 (La.App. 2d Cir.), writ denied 584 So.2d 1160 (1991). General damages for wrongful death were not subject to reduction because the surviving spouse remarried. McFarland v. Illinois Central R. Co., supra. *241 In 1982, however, the legislature amended La.C.C. art. 2315 to specify that lost services are an element of damages. La.Acts 1982, No. 202.[3] The trial court interpreted this amendment as placing the lost services on a separate, financial footing, thus subjecting the award to reduction or mitigation if someone else was now performing those services for the surviving spouse. We feel, however, that this was not the purpose of the amendment; rather, it was to permit these damages in non-fatal injuries. See Andre, Louisiana Wrongful Death and Survival Actions (Austin: Butterworth Legal Publ., 1989), § 1-12. A close review of the jurisprudence shows that even before the amendment, evidence of remarriage was inadmissible to mitigate the survivor's special damages. See Jones v. Kansas City Southern Ry. Co., 137 La. 178, 68 So. 401 (1915) (on rehearing), rev'd on other grounds 241 U.S. 181, 36 S.Ct. 513, 60 L.Ed. 943 (1916). Given the history of the rule and the intent of the 1982 amendment, we conclude that evidence of the surviving spouse's remarriage is not admissible to offset or defeat the claim of lost services.
We also feel that the trial court's requirement of "actual out-of-pocket losses" to support an award is too restrictive. True, lost earnings must be proved to a reasonable certainty. Thomas v. State Farm Ins. Co., supra; Finley v. Bass, supra. However, like all future damages they need not be shown precisely. The obvious intent of art. 2315 is to authorize recovery, not to eliminate it. Even though the plaintiffs did not produce actual proof of replacement costs, they laid a foundation and offered expert testimony to generate a reasonably certain estimate of the loss. See Mims v. Reliance Ins. Co., 535 So.2d 1085 (La.App. 2d Cir.1988). The trial court was plainly wrong to deny this element of damage.
As noted, Dr. Moser gave a low-end estimate of $182,193.22 for the value of Mrs. Moore's services. He was incorrect, however, to base it on her life expectancy; Dr. Moore can recover only for the duration of his own life, and the children until they reach majority. Therefore Dr. Moser's estimate must be lowered to effect a fair and equitable award. La.C.C.P. art. 2164.
Dr. Hood's estimate for total lost services was $108,231.75. He was incorrect, however, to reduce this by Mrs. Moore's consumption for the remainder of the marriage. Such an offset would be permissible for an award of lost future income, because it is reasonable to assume that the wife would apply some of her own income to her own use. However, Dr. Moore was obligated to support his wife regardless of the measure of household services she provided. La.C.C. art. 98. Dr. Hood was correct to show that recoverable services are those which benefit the surviving spouse and minor children; he did not include an award for children after they reached majority.
We would also note that Mrs. Moore spent much of her time in volunteer work; the family traveled and ate out frequently; and the daughters helped her with some household chores. Under the circumstances, we feel an award of $108,000 would adequately compensate Dr. Moore, Liza and Philip Pinegar for the lost services. In light of the time that each of these plaintiffs would have received the services, damages are allocated as follows:

Dr. Moore $58,000.00
Philip Pinegar 30,000.00
Liza Pinegar 20,000.00

The judgment will be amended accordingly.
The trial court awarded general damages of $50,000 to Mrs. Moore's major daughter, Julia Bailey, $75,000 each to her minor children, Liza and Philip Pinegar, and $150,000 to Dr. Moore for wrongful death. Mrs. Moore was an active homemaker who also found time for charity work and church functions. Julia and Liza *242 testified that Mrs. Moore joined in many of their activities, and was "one of the girls." At age 18, Julia was about to start college. Philip had experienced some adolescent problems. The record supports the trial court's finding that Mrs. Moore's relationship with her family, while "perhaps not extraordinary," was "stable and full of mutual love and respect." The court's factual observations about the Moores' marital fidelity are fully supported. We are not able to say that the instant awards are an abuse of discretion.
Furthermore, the awards are not out of step with the mass of past awards in similar reported cases. In Thomas v. State Farm, supra, we observed that awards for wrongful death of a spouse ranged from $7,000 to $200,000, with $100,000 being the most frequent award and $150,000 following closely behind. Awards to minor children for the loss of a parent ranged from $25,000 to $150,000, with most falling between $40,000 and $100,000. Awards to major children ranged from $20,000 to $75,000 with no specific concentration. Both parties submitted Thomas for the trial court's consideration and the awards certainly fall within the range of cases surveyed therein.[4] This assignment lacks merit.

Conclusion
For the reasons expressed, the judgment is amended to reflect the additional quantum for lost services, the additional percentage of fault of Bill Allen Dodge, who settled prior to trial, and the reduced percentage of fault of McAdams. Judgment is rendered as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein as follows:
(1) In favor of plaintiff, GENE D. MOORE, and against defendant, McADAMS CUSTOM BUILDING INC., in the full and true sum of EIGHTY-THREE THOUSAND, TWO HUNDRED AND .00/1.00 ($83,200.00) DOLLARS;
(2) In favor of plaintiff, LIZA SUZANNE PINEGAR, and against defendant, McADAMS CUSTOM BUILDING INC., in the full and true sum of THIRTY-EIGHT THOUSAND AND .00/1.00 ($38,000.00) DOLLARS;
(3) In favor of plaintiff, PHILIP ALLEN PINEGAR, and against defendant, McADAMS CUSTOM BUILDING INC., in the full and true sum of FORTY-TWO THOUSAND AND .00/1.00 ($42,000.00) DOLLARS;
(4) In favor of plaintiff, JULIA LYNN BAILEY, and against defendant McADAMS CUSTOM BUILDING INC., in the full and true sum of TWENTY THOUSAND AND .00/1.00 ($20,000.00) DOLLARS;
(5) In favor of plaintiff, GENE D. MOORE, and against defendant, McADAMS CUSTOM BUILDING INC., in the full and true sum of TWO THOUSAND, NINE HUNDRED SIX AND .92/ 1.00 ($2,906.92) DOLLARS, for funeral expenses.
All sums represent the proportionate judgment in favor of the respective plaintiffs after reduction for negligence attributable to pre-trial settlements.
And all sums awarded by this judgment bear interest from date of judicial demand until paid.
Costs of appeal are assessed equally to McAdams Custom Building Inc. and the plaintiffs.
AMENDED, AFFIRMED AND RENDERED.
SEXTON, J., concurs in part and dissents in part with written reasons.
SEXTON, Judge, concurring in part and dissenting in part.
With respect to liability because of a lack of a warning, I am not persuaded by the opinion's reliance on Bloxom v. Bloxom, 512 So.2d 839 (La.1987), which pronounces the presumption that those warned will follow that warning. Bloxom is a plurality *243 opinion signed by only three justices. My research has been unable to locate the anticipated assignment of concurring reasons from Justice Lemmon. Thus, his thoughts on the subject are undetermined. The other concurring justice also offered no reasons. Likewise, no other supreme court case on this point could be located. It should also be noted that Bloxom`s reliance on Benoit v. Ryan Chevrolet, 428 So.2d 489 (La.App. 2d Cir.1982), is of little assistance as that is also a plurality opinion by this court.
However, there can be no doubt that there were no seat belts in this van other than those provided for the two front seats. Thus, anywhere Mrs. Moore may have located herself did not offer her seatbelt protection. That is negligent design. The record does reflect that it was her intent to lie down and that she was asleep at least until the inception of the accident. (There is some record indication that the onset of the accident may have disturbed her and caused her to rise up and kneel between the two front seats prior to being ejected.) Thus, I concur that the negligent failure to equip the vehicle with rear seat belts equates to liability on the defendants under the instant circumstances.
I dissent from the opinion in two respects. The opinion dismisses the importance of LSA-R.S. 32:416.1. That statute makes it unlawful for 15 and 16 year olds to drive between 11:00 p.m. and 5:00 a.m. during the week and between midnight and 5:00 a.m. on Friday through Sunday. The opinion finds solace in the fact that this 15 year old was three months shy of her sixteenth birthday and the fact that the accident may have happened shortly before midnight.
I disagree. The obvious purpose of the statute is to protect all of those on the roadway, including a juvenile's passengers, from accidents such as this. Dr. and Mrs. Moore allowed this relatively inexperienced driver to drive late in the evening while they slumbered. They should bear some measure of responsibility. Further, I can't put any reliance on Dr. Moore's statement that he, a medical doctor, was so keen against drinking and driving that he did not want to drive because he had had a drink several hours earlier before leaving Monroe. He knows or should know that any single drink had oxidized well before the return trip.
Also, I disagree with the allocation of only 20 percent of the fault to Liza. I believe that it should be substantially higher. The fact that she fell asleep was the major cause of this accident.
In all other respects, I agree with the opinion.
NOTES
[1] The numerical designations are the parties'.
[2] Injuries occurring on or after September 1, 1988 are now regulated by the Louisiana Products Liability Act, La.R.S. 9:2800.51-.59. Gilboy v. American Tobacco Co., 582 So.2d 1263 (La. 1991); Berry v. Commercial Union Ins. Co., 565 So.2d 487 (La.App. 2d Cir.), writ denied 569 So.2d 959 (1990).
[3] The trial court erroneously stated that this amendment occurred in 1984. The 1984 amendment added a third paragraph, which is now redesignated as art. 2315.1. See La.Acts 1984, No. 397; La.Acts 1986, No. 211.
[4] See also Quantum Study: Louisiana Personal Injury Awards 1987-1989, 35 Loyola L.Rev. 1151, 1348-1358 (1990).